[Nos. 28326, 28327. *En Banc.* November 24, 1941.]

JOE HAUSWIRTH, *Individually and as Guardian ad Litem for Richard Hauswirth, a Minor, Respondent,* v. HAROLD POM-ARLEAU *et al., Appellants.*

JOE HAUSWIRTH, *as Administrator, Respondent,* v. HAROLD POM-ARLEAU *et al., Appellants.*[1]

[1]Reported in 119 P. (2d) 674.

*Caldwell, Lycette & Diamond* and *R. D. Kendall,* for appellants.

*J. A. Adams* and *Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondent.

STEINERT, J.—Plaintiff brought two actions to recover damages resulting from an automobile collision alleged to have been caused by the negligence of defendants. In the first action, plaintiff, individually and as guardian *ad litem* for his eighteen year old son, Richard Hauswirth, sought recovery for personal injuries to the minor, for medical expenses, and for loss of the minor's services. Defendants in their answer denied negligence on their part, pleaded contributory negligence on the part of Richard Hauswirth, the minor son, and by way of cross-complaint sought recovery of damages caused by the collision resulting in the demolition of their automobile and in personal injuries to defendant Harold Pom-Arleau, who also was eighteen years old. Plaintiff's reply denied the affirmative allegations of the answer and cross-complaint.

In the second action, plaintiff, as administrator of the estate of Annie Laurie Hauswirth, his deceased wife, sought recovery for the injuries, suffering, and death of his wife, and for medical and funeral expenses, all resulting from the collision, and alleged to have been caused by the negligence of defendants. In their answer to the complaint in that action, defendants again denied negligence, and affirmatively pleaded the contributory negligence of Richard Hauswirth as im-

putable to the deceased, which in turn was put in issue by the reply.

The two actions were consolidated for trial by jury and resulted in verdicts for plaintiff on both complaints. Defendants moved, in each case, for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The motions were denied in their entirety, and a judgment was entered upon each verdict. Defendants appealed, and thereafter, by stipulation of the parties, the two actions were consolidated on the appeal.

The assignments of error are predicated upon (1) the refusal of the trial court to grant appellants' motions for nonsuit; (2) the refusal of the court to grant appellants' motions for judgment notwithstanding the verdicts; (3) the admission and the exclusion of certain evidence; (4) the refusal of the trial court to declare a mistrial because of misconduct of respondent's counsel; and (5) the giving by the trial court of certain instructions, and its refusal to give certain other instructions proposed by appellants. Our decision herein is based solely upon the refusal of the trial court to grant appellants' motions for judgment notwithstanding the verdicts, to the extent hereinafter stated.

The accident out of which these actions arose occurred at about three-fifteen o'clock on the morning of November 1, 1939, in the intersection of Fifth street and Western avenue, about a mile west of the city of Wenatchee. Fifth street, originating in Wenatchee, extends beyond the city limits in a westerly direction and, in the vicinity of the intersection here involved, is a nonarterial street. Western avenue, which is outside and west of the city, runs in a northerly and southerly direction and is an arterial highway. The two streets cross each other approximately at right angles. In the vicinity of the place where the accident

occurred, both streets were paved along the center with black-top to a width of about sixteen feet, leaving a gravelly margin of several feet on either side. Stop signs were posted at appropriate places near the inter-section to warn travelers on Fifth street that Western avenue was an arterial highway. The sign at the north-east corner was located a few feet east of the east edge of Western avenue.

At the southeast corner of the intersection was an old cherry orchard. The trees were quite large and had low-hanging branches which extended very close to the margins of the two streets. Near that corner was also some heavy brush. These conditions partially obstructed the vision to the south as one approached from the east and, likewise, obstructed the vision to the east as one approached from the south. However, the two streets are almost straight in all directions from their common point of intersection and, as plainly appears from the photographic exhibits in the record, the view to the south from the east margin of Western avenue is unrestricted for a considerable distance south of the intersection.

Respondent Joe Hauswirth and his family lived on a ranch about a mile and a half west and north of the intersection here involved. Mrs. Hauswirth, who was forty-two years of age, was employed as an apple sorter at a fruit packing plant in Wenatchee. She worked on a night shift which ended at three o'clock in the morning. The Hauswirths possessed a Chevrolet coupe, which they used as a family car.

On the night of October 31st, which was Halloween, Richard Hauswirth, the eighteen year old son of re-spondent Joe Hauswirth, was using the car. After taking a girl friend for about an hour's ride in the early part of the evening, he drove alone to Wenatchee, ar-riving there at about eleven o'clock, intending to take

his mother home after she had finished her work. Having several hours to wait, he went to a railroad depot just across the tracks from the packing plant and there spent his time trying to sleep. At three o'clock in the morning he called for his mother, and the two started for their home, which was about three and one-half miles west of the packing plant. They were driving west along Fifth street when the collision occurred. The weather conditions at the time were good, it being a clear, moonlit night.

Appellant Harold Pom-Arleau resided with his parents in Wenatchee. The Pom-Arleaus owned a Ford sedan, which was customarily used by them as a family car. On the evening in question, Harold was using the automobile and was accompanied by George Gasper, a boy friend of about Harold's age. Starting with the car at about seven-thirty o'clock, they attended a party, where they remained for approximately an hour and a half. Toward midnight, they visited a dance hall, where they met two girls and within fifteen or twenty minutes thereafter left with the girls to attend a midnight Halloween show in Wenatchee. Leaving the theater at about one-thirty or two o'clock in the morning, the party of four repaired to a restaurant, where they had a spaghetti dinner. After they had finished their meal, the boys took the two girls home and then started for Gasper's home, which was about three-fourths of a mile north of the intersection of Fifth street and Western avenue. They entered Western avenue at a point about a mile south of the intersection and were proceeding north along the arterial highway when the collision occurred. The speed limit upon the arterial was fifty miles per hour, except at intersections, where it was thirty-five miles per hour.

With the exception of the occupants of the two cars,

there was no eyewitness to the collision or to the movement of either vehicle immediately prior to the impact. There was testimony, however, from several persons as to the manner in which the one car or the other approached the intersection, and there was considerable testimony by persons who appeared upon the scene very shortly after the collision and who observed its results. The three boys who were involved in the accident all testified at the trial; Mrs. Hauswirth, however, had died on the day following the tragedy.

It is undisputed that the Hauswirth car, proceeding west along Fifth street, entered the intersection first; that the impact occurred in the *southeast* quarter of that area, at a point approximately seven or eight feet from the east and south lines, respectively, of the intersection; that the front end of the Pom-Arleau car collided with the left side of the Hauswirth car, about opposite the driver's seat; that the Hauswirth car was carried a distance of thirty-four feet from the point of impact, over to the northwest corner of the intersection, where it struck and broke a concrete retaining wall which stood thirteen inches high, then rolled over the wall and came to rest upside down, against a tree on the adjoining lawn; and that, immediately following the collision, the Pom-Arleau car also proceeded over to the northwest corner of the intersection, struck and rolled along the concrete wall in a northerly direction on Western avenue, and finally stopped, lying on its side in the street, about sixty feet from the point of the impact.

Both cars were almost entirely demolished, and all four of the occupants were seriously injured. Richard Hauswirth was rendered unconscious for a period of nine days; Mrs. Hauswirth, although she regained consciousness, died the next day; Harold Pom-Arleau sustained a broken leg, a bad scalp wound, and a

number of cuts and bruises; and George Gasper suffered a brain concussion, had a number of teeth knocked out, and received a severe injury to his hand, besides other cuts and bruises.

Respondent's complaints charged appellants with negligence in two respects: (1) That Harold Pom-Arleau was operating the Ford sedan at a rate of speed in excess of fifty miles per hour, and (2) that he was at the time driving without lights.

In view of the conclusion at which we have arrived herein, we deem it best to quote directly from the testimony given by Richard Hauswirth, the driver of the Chevrolet coupe. On direct examination, he testified as follows:

"Q. Tell what route you took, when you got your mother. A. I left the Independent Fruit Shippers, came underneath the viaduct and up Kittitas Street to the Avenue, and went up the Avenue to Fifth. I stopped there, because the light was red. I turned left on Fifth Street, and went out Fifth Street to Miller. I stopped at Miller, and went out Fifth to Western and stopped there. I looked both ways, and started across the street, and that's the last I remember. Q. You say you stopped at Fifth and Western and looked both ways? A. I did. Q. Did you change gears at that time? A. I did. Q. What did you do? A. I put it in low gear. Q. And started across the street? A. Yes. Q. And that is the last you remember? A. And that's the last I remember. . . . Q. When you looked up the street, what do you mean by looking up the street both ways on Western when you stopped? A. I looked to my left, and looked to my right. Q. Did you see any cars either to your left or to your right? A. No, I didn't. Q. Did you see any car lights either to your left or to your right? A. No, I didn't. Q. You started, then, from a standing stop across Western Avenue? A. I did. Q. Driving the car. You have no recollection of where you were when you were struck, if you were struck, by another car? A. No, I don't. Q. How far could you see up Western Avenue, that would be south,

I call it. They call it east here. It is actually more south than east. That would be back this way, wouldn't it? Assuming Western Avenue runs the same way this table is, you come up to Western and look down that way, to your left? A. Yes. Q. How far down could you see, when you looked? A. About 100 feet. Q. And you saw no car? A. No, I didn't. Q. And no evidence of any car? A. No."

On cross-examination, he testified as follows:

"Q. After you passed Miller, and were going towards Western,—about how far is it, by the way, between Miller and Western? A. About a mile. Q. And as you were traveling from Miller to Western, you traveled on that highway around forty-five miles an hour, didn't you? A. Yes, I did. Q. And, you say, when you came to the intersection with Western,—By the way, you knew Western was an arterial highway? A. I did. Q. You have been over that a great many times? A. Yes, sir. Q. And there is a 'Stop' sign on the east side of Western, on Fifth street, isn't there, facing as you come right up to the Avenue, there is a 'Stop' sign, facing you? A. Yes, sir. Q. And you knew that sign was there, didn't you? A. I did. Q. As you came up there, you put on your brakes and brought your car to a stop? A. I did. Q. You said at the place at which you stopped, at that place you gave a look to the south, that is, to your left? A. Yes, sir. Q. And you also looked to your right? A. That's right. Q. As I understood you, at the place where you looked you said you couldn't see down to your left, that is, to the south, you said you could see a distance of about 100 feet? A. Yes, sir. Q. Now, I am going to call this Fifth, again, and this, Western; north is towards you, so you would be going towards Western; referring, now, to the southeast corner of this intersection, you are familiar with that, aren't you? A. Yes, sir. Q. That area in there is used as a cherry orchard, isn't it? A. Yes, sir. Q. And the cherry trees come pretty close to Western, and pretty close to Fifth, don't they? A. Yes, sir. Q. I would judge that is a rather old cherry orchard, because the trees are quite large, are they not? A. Yes, sir. Q. And the branches, at that time of year, were quite low on the trees?

A. Yes, sir. Q. At that time, in addition, was there any brush on the corner? A. There was a little bit of brush. Q. As a matter of fact, wasn't there a lot of brush, a big bush, or something, that obstructed your vision? A. Yes, sir. Q. You say, there was? You say, you looked down there, and stopped at a point where you could look down 100 feet. I am curious to know why you say it was 100 feet, why you fix that distance at 100 feet? A. Why, that is just about as far as it was. Q. Have you been back there to figure it out? A. No. Q. The impression of 100 feet, is that what you carried away from that evening? A. A hundred feet is about as far away as I could see. Q. Was there any landmark there by which you fixed it? A. No. Q. Anything on the highway? A. No. Q. You just think it was 100 feet? A. That is what I think, yes. Q. In looking down there, where could you see 100 feet? Did you have to look through the cherry trees some? A. A little bit. Q. And through some of the bushes on the corner, to be able to see that? A. I was just out a little bit, so I could see around the brush. Q. Well, now, let's get at it another way—By the way, you only made one stop, didn't you? A. What do you mean, 'One stop'? Q. When you came up there, you stopped, took a look, put her in gear, and started? A. That's right. Q. And you never stopped again, outside of when the impact took place? A. I don't know. Why should I stop? Q. I am asking you. You say, you didn't? A. No. Q. And you looked, and saw no car to your right, and no car to your left? A. That's correct. Q. There was no car ahead of you, that evening? A. No. Q. No car behind you? A. No. Q. You didn't see any car on ·Western? A. No. Q. Nor on Fifth? A. No. Q. At that time, at that hour, there was practically no traffic at all in the vicinity?. A. That's right. Q. The 'Stop' sign I have referred to; now, that is over along Fifth Avenue, at the northeast corner of this intersection, isn't it? A. Yes. Q. Alongside the road. Speaking with reference to that 'Stop' sign, where was that, with reference to where you stopped? A. I had the nose of my car just a little bit forward of that, so I could look around that bush. Q. You are facing to ·the west, and the nose of your car was just a little bit ahead of the

364

'Stop' sign. The 'Stop' sign would be on your right, wouldn't it? A. Yes. Q. And the nose of your car would be how far ahead of it? A. It wasn't out on Western Avenue. Q. No. How far would you say it was ahead of it? A. Four or five feet. Q. Where were you? You were sitting in the seat, weren't you? A. The 'Stop' sign was about even with it. Q. The seat of your car, and that means your body and head, was just about on a line with the 'Stop' sign? A. Yes. Q. You say, at that point you took a look, and you could only see 100 feet down the highway? A. That's right. Q. Don't you know you can see 400 feet down the highway? A. No, I don't. Q. What part of Fifth were you traveling on? Traveling to the extreme right or, like most people do, traveling pretty near in the middle? A. I was pretty well in the middle. There were no cars there. Q. On Western they travel pretty well the same way, also, don't they? A. Yes, sir. Q. You came to this stop, you say, with yourself just about opposite the 'Stop' sign. How far was it, then, from where you were to where the pavement was, the traveled portion, on Western? How far was your car from the traveled portion of Western? A. I don't know. · Q. Can you give us any estimate at all? MR. ADAMS: What part of the car do you refer to? Q. (Mr. Lycette): The front of the car. A. Well, it was right on the edge. Q. The front of your car was right on the edge? A. The edge of Western. Q. At that point. Then, you say, you shoved it into gear? A. I did. Q. And that is the last thing you know? A. That's right. Q. You didn't see lights at any time, did you? A. I didn't see no lights. Q. You didn't see any car at any time, did you? A. I didn't see any car, any time. Q. And you never heard a car? A. That's right. Q. By the way, the evening, the condition of the weather, it was a nice, bright, moonlight night, wasn't it? A. Yes, it was. . . . Q. And you were perfectly familiar with the car you were driving? A. I was. Q. After you had come to a stop, and then put it in gear again and started forward, you could stop that car absolutely instantly by taking your foot off the gas, couldn't you, when it is in low gear? A. Just about, yes."

Upon the question of excessive speed on the part of appellants' car, respondent called four witnesses, three of whom lived about a quarter of a mile south of the intersection, and the other of whom lived about one hundred fifteen feet south of the intersection. Three of these witnesses had been sound asleep just before the time of the accident, and the other had previously been asleep but having awakened had arisen and was just then returning to bed. Each of the four witnesses testified that he had heard a car go by his home emitting a roar as if running at a high rate of speed, and almost immediately thereafter he had heard a loud crash. One of them said that the crash sounded "like a car had run through a house, or something." Another stated that it sounded like barrels rolling together. Still another compared the noise to that of a house falling down. The witness who was awake at the time the car passed his home testified that he saw the flash of the lights of the car as it went by. The estimates of these witnesses as to the interval of time between the sound of the roar of the car as it passed their homes and the sound of the subsequent crash varied from one second to almost a minute.

Harold Pom-Arleau and George Gasper, witnesses for appellants, both testified that as they approached Fifth street they were traveling at a speed of not over forty-five miles per hour, and that the headlights of their car were burning; that, as they came within about sixty feet of the intersection, they saw the lights of the other car on Fifth street approximately an equal distance from the intersection; that the other car was approaching the intersection at about the same speed as that of their own car; that they then slowed down to about thirty-five miles per hour; and that the other car, instead of stopping or slowing down, proceeded directly into the intersection in front of them, making

the collision inevitable, although Harold had attempted to avoid the impact by swerving to his left when he realized that the other car was not going to stop.

Harry Leo Brown, fourteen years of age, was also called as a witness for appellants. His testimony in substance was as follows: His home was located at the northwest corner of the intersection and faced east. On the night in question, he had attended the midnight show referred to above, and at the end of the performance at about two a. m. he had walked home, a distance of about two miles. After eating a lunch, he repaired to his sleeping quarters on the front porch, where he had a view east along Fifth street for about a block. Looking in that direction, he noticed a car approaching rapidly from the east and at the distance just stated. He did not follow the movements of the car, but almost immediately thereafter heard the crash. Prior to the crash, he had not heard any sound indicating that the car had slowed down, or had stopped, or that its driver had shifted gears. He stated that, if any of those sounds or noises had been made, he would have heard it.

We first direct our attention to the two alleged grounds of negligence upon which recovery was sought. The burden was, of course, upon respondent to prove that appellants' negligence was the proximate cause of the injuries.

In our opinion, the evidence was insufficient to warrant a finding that appellant Harold Pom-Arleau was driving the Ford sedan without lights. There is no presumption that the lights of the automobile were not burning at the time of the collision. *Poland v. Seattle*, 200 Wash. 208, 93 P. (2d) 379; *Crystal v. Baltimore & B. A. Electric R. Co.*, 150 Md. 256, 132 Atl. 629.

The only evidence offered by respondent upon that issue was the testimony of Richard Hauswirth, who

merely stated that he saw no lights. That evidence was purely negative in character, had no more than a speculative value, and did not constitute substantial evidence within the rule requiring that a finding or verdict must be supported by a preponderance of the evidence. *Poland v. Seattle, supra,* and cases therein cited. On the other hand, there was positive, affirmative evidence that the lights were burning at the time. Appellant Harold Pom-Arleau so testified, although he was an interested witness. George Gasper, however, was a disinterested witness, according to the technical understanding of that term, and he testified to the same effect; nor was he cross-examined by respondent. More than that, one of respondent's own witnesses testified that he saw the flash of the lights of the car as it roared past his home just before he heard the sound of the crash.

In view of the definite testimony that the lights were burning, and in further view of the absence of substantial evidence to the contrary, we must hold that the only finding that properly could have been made upon that issue was that the lights of the Pom-Arleau car were burning at, and immediately before, the time of the collision.

Upon the other ground of alleged negligence, namely, that of excessive speed, we are of the opinion that the evidence was sufficient to warrant a finding by the jury that the speed of the Pom-Arleau car was excessive under the existing circumstances, and that the excessive speed was a proximate cause of the collision and its consequences. While Harold Pom-Arleau and George Gasper both testified that they had been proceeding along Western avenue at not more than forty-five miles per hour, and that they had slowed down to less than thirty-five miles per hour before entering the intersection, still the circumstantial evi-

dence was, in our opinion, more than sufficient to convince the jury that Harold entered the intersection at a rate of speed greater than the thirty-five miles per hour permissible under the statute (Rem. Rev. Stat., Vol. 7A, § 6360-64 [P. C. § 2696-891]).

In this connection, we have, first, the testimony of the witnesses who heard the roar made by the passing car, and the sound of the collision immediately following. In view of the brief interval between the roar of the passing car and the sound of the crash that followed, as testified by some of the witnesses, and in view of the fact that it is conceded that no car other than the two here involved was in the vicinity of the scene of the accident at the time, we cannot agree with appellants that the testimony of the several witnesses who resided along Western avenue was inadmissible, even though the distance from their homes to the intersection was, in most instances, a quarter of a mile. Under the circumstances, the jury was entitled to consider that evidence for what it was worth.

Added to the testimony just referred to was the evidence of the violence of the impact, as shown not only by the reverberation of the collision, but particularly by the distances to, and the force with, which the respective automobiles were hurled, and by the damage to the respective vehicles and their occupants.

■ The nature of an impact and the violence of a collision, together with its results, may be taken into consideration in connection with all the other circumstances in determining the rate of speed of a colliding vehicle. *Osborn v. Seattle,* 142 Wash. 25, 31, 252 Pac. 164; *Day v. Polley,* 147 Wash. 419, 423, 266 Pac. 169; *Harry v. Pratt,* 155 Wash. 552, 556, 285 Pac. 440; *Hunter v. Lincoln Stages, Inc.,* 161 Wash. 634, 637, 297 Pac. 179; *Copeland v. North Coast Transportation Co.,* 169 Wash. 84, 91, 13 P. (2d) 65; *Gaskill v. Amadon,* 179

Wash. 375, 380, 38 P. (2d) 229; *Pyle v. Wilbert,* 2 Wn. (2d) 429, 434, 98 P. (2d) 664; *Oyster v. Dye,* 7 Wn. (2d) 674, 679, 110 P. (2d) 863; *Johnson v. Ohman,* 10 Wn. (2d) 466, 117 P. (2d) 217.

The evidence being sufficient, in our opinion, to establish excessive speed, the verdict of the jury upon that issue is controlling. Harold Pom-Arleau having thus been found to have been guilty of negligence which was a proximate cause of the collision, appellants were not entitled to a directed verdict upon their cross-complaint, and to that extent their motion for judgment notwithstanding the verdict was properly denied.

This leaves for consideration the question of the contributory negligence of Richard Hauswirth. It will be remembered that the collision occurred in the southeast quarter of the intersection at a point approximately seven or eight feet from the east and south lines, respectively, of that area. With the exception of the photographs to which we have already referred, the only evidence upon the issue under consideration is contained in the testimony of Richard Hauswirth himself. His testimony, already set forth in detail, was, in substance, that before reaching the vicinity of the intersection he had been driving at a speed of about forty-five miles per hour; that at the southeast corner of the intersection was a cherry orchard and some brush that partly obstructed his view to the south; that a stop sign was located at the northeast corner, a few feet east of the edge of Western avenue; that he was perfectly familiar with the existing conditions, and knew that Western avenue was an arterial highway; that as he came to the intersection he put on his brakes and stopped near the edge of Western avenue; that at the point where he stopped he could see about one hundred feet south along Western avenue; that, after

stopping, he looked to his left and to his right and saw no car nor any lights approaching from either direction; that he then shifted into low gear, started forward, and that was the last thing he remembered. It is conceded that he stopped but once, that he looked but once to his left or to his right, and that he could have stopped again almost instantly by simply lifting his foot from the gas pedal, and certainly by pressing the brake pedal. It is apparent that after starting he had traveled but a short distance when he was struck.

The doctrine of contributory negligence is founded upon the principle that no one is ever absolved from exercising reasonable and ordinary care for his own safety, in the light of the existing circumstances. *Morris v. Chicago, Milwaukee, St. P. & Pac. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19.

The duties imposed upon automobile drivers approaching and desiring to cross an intersecting arterial highway are prescribed by Rem. Rev. Stat., Vol. 7A, § 6360-90 [P. C. § 2696-848], which provides:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped shall look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection."

The statute thus requires that one approaching and intending to cross an arterial highway shall (1) stop at the entrance to the intersection, (2) having stopped, look out for vehicles upon such arterial highway simultaneously approaching a given point within the intersection, and (3) give right of way to such approaching vehicles upon the arterial highway.

Although there was positive evidence from disinterested witnesses, George Gasper and Harry Leo Brown, to the effect that Richard Hauswirth did not

stop at the intersection, Richard testified positively that he did stop. There being a conflict in the evidence upon that clear-cut issue of fact, the verdict of the jury is controlling upon that question.

As to what Richard Hauswirth did after he had stopped at the intersection, the facts are undisputed and present an issue which, if decided adversely to respondent, must be decided as a matter of law. We are now dealing with those facts which are governed by the provisions of the above statute requiring the driver who has approached and stopped at the entrance to an intersection with an arterial highway to "look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection."

Since the two cars collided within the intersection, it must be held that prior thereto they were "simultaneously approaching a given point within the intersection," as that phrase has been construed by this court. *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, and cases following it. The exception noted in that case, with respect to a situation where the disfavored driver is "deceived" by the wrongful operation of the favored driver, has no application here, for the reason that, in this case, Richard Hauswirth never saw the Pom-Arleau car at all; he therefore could not have been deceived by its wrongful operation. The exception referred to in the *Hadenfeldt* case, *supra,* presupposes a situation where the disfavored driver sees or has the opportunity of observing the favored vehicle and is deceived by the actions of the driver of that vehicle. *Bowen v. Odland,* 200 Wash. 257, 93 P. (2d) 366; *Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371; *Jamieson v. Taylor,* 1 Wn. (2d) 217, 95 P. (2d) 791.

Although Richard Hauswirth may have looked to his left, as he says he did, the question here is not

whether he merely looked, but whether or not, under the existing conditions and circumstances, he looked from a point or position from which he should have finally looked, and whether or not, having looked from the specific point where he stopped, his subsequent actions were consistent with the principle stated above that no one is ever absolved from exercising reasonable and ordinary care for his own safety, according to the existing circumstances.

We have had occasion to construe the provisions of the above statute, and also like provisions of similar statutes, and have consistently held that, in situations of the kind here involved, the person upon whom rests the duty of stopping and looking out for vehicles having the right of way must look, or stop and look, from a position where he can see approaching traffic from either direction. *Hamilton v. Cadwell,* 195 Wash. 683, 81 P. (2d) 815; *Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371; *Hefner v. Pattee,* 1 Wn. (2d) 607, 96 P. (2d) 583; *Pyle v. Wilbert,* 2 Wn. (2d) 429, 98 P. (2d) 664; *Fetterman v. Levitch,* 7 Wn. (2d) 431, 109 P. (2d) 1064; *Weaver v. McClintock-Trunkey Co.,* 8 Wn. (2d) 154, 111 P. (2d) 570, 114 P. (2d) 1004.

In the *Hefner* case, *supra,* we said:

"It must be borne in mind that respondent [plaintiff] testified that, when he stopped his car, he looked to the north along Thirty-fifth avenue approximately three hundred feet, while there was a clear view along that highway for half a mile. If, from the point where respondent made this observation ['ten or twelve feet east of the paved portion of Thirty-fifth avenue'], he could see only three hundred feet along the arterial, whether because of obstructions, or because of the eight per cent down grade of Thirty-fifth avenue, or because of the angle from which he was looking, then he was negligent in not looking again to his right [from which direction the *favored* driver in that case was approaching] when he reached a point where his view was unrestricted. On the other hand, if, from the point

where he made the observation, he could see half a mile along Thirty-fifth avenue, then he should have seen appellant's [defendant's] car approaching, and taken steps to avoid it. He testified positively that he did not see appellant's car until it was approximately three car lengths away.

"The burden rests heavily upon the disfavored driver to look out for and give way to traffic which enjoys, as to him, the right of way. Appellant's automobile was there to be seen. The disfavored driver cannot escape the obligation which rests upon him, by saying that he did not see an approaching vehicle, if such vehicle was on the highway and plainly visible. [Citing cases.]

"There can be no question but that, from any portion of the level part of Thirty-fifth avenue, one could see to the north along that street at least half a mile. While we do not hold that respondent was bound to stop at the edge of the pavement, he was bound to look to his right as well as to his left before undertaking to cross the pavement, and he was obligated to look from a position where he could observe approaching traffic."

Recognizing the caution which one in a situation similar to that of Richard Hauswirth in this case must exercise, this court made the following observation in *McAllister v. Anderson,* 169 Wash. 14, 13 P. (2d) 36:

"When one driving on a non-arterial street or highway approaches an arterial highway, he knows and is bound to know that travelers thereon having or assuming to have the right of way will be traveling at considerable speed and keeping less than the usual outlook for intercepting cross-traffic. This is especially true at midnight, when travelers, presuming upon absence of congestion, are prone to greater speed and less care for others than may be expected in the busy hours of day."

Expressed in language which reveals the very purpose sought to be accomplished by the law and which, at the same time, provides a standard for proper human conduct, the rule requires the disfavored driver to look from a point at which he can see and reasonably de-

cide whether or not he can proceed across an intersection with a fair margin of safety at all times, both to himself and to other users of the highway. The term "fair margin of safety" has been used so often in our decisions that it has virtually become a formula. In the recent case of *Fetterman v. Levitch,* 7 Wn. (2d) 431, 109 P. (2d) 1064, the consensus of our holdings was stated thus:

"What this court has frequently declared, and more often indicated, the correct rule to be, and the rule which we again repeat, and now adhere to, is that the *primary,* not the absolute, duty of avoiding an accident at an intersection rests upon the driver on the left, which duty *he must perform with reasonable regard to the maintenance of a fair margin of safety* at all times. *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533; *Martin v. Westinghouse Elec. & Mfg. Co.,* 162 Wash. 150, 297 Pac. 1098; *Teshirogi v. Belanger,* 167 Wash. 278, 9 P. (2d) 66; *Sather v. Blodgett,* 169 Wash. 25, 13 P. (2d) 60; *Hamilton v. Lesley,* 174 Wash. 516, 25 P. (2d) 102; *Huber v. Hemrich Brewing Co.,* 188 Wash. 235, 62 P. (2d) 451; *Perren v. Press,* 196 Wash. 14, 81 P. (2d) 867; *Gibson v. Spokane United Railways,* 197 Wash. 58, 84 P. (2d) 349.

"In the performance of the duty resting upon him, it is obviously essential that the disfavored driver look to his right from a point *at which he can see and reasonably decide* whether he can proceed across the intersection with a fair margin of safety. The maximum distance from the curb line at which the required observation may be made necessarily depends upon the surrounding conditions and circumstances. In the case of a completely obstructed corner, one, for instance, where a building is constructed along the two property lines, such observation can, obviously, be made only at, or practically at, the curb line. In the case of a wholly unobstructed corner, as, for instance, one where there is an open, vacant lot, level with the street, and with nothing upon its surface, the observation, manifestly, can be made at an earlier point. Between these two extremes, the required points of observation must

necessarily vary. In each instance, however, the rule is the same, namely, that the observation must be made from such point as will enable the driver to see and reasonably decide whether he has, and can maintain, a fair margin of safety."

In that case, neither of the two intersecting streets was an arterial highway, and hence the disfavored driver was simply the one on the left. In that case, also, the duty of the disfavored driver was governed by Rem. Rev. Stat., Vol. 7A, § 6360-88 [P. C. § 2696-846], which required the operator of a vehicle on *approaching* a public highway intersection to look out for and give right of way to vehicles on his right. In a case such as we have here, the disfavored driver is the one on the nonarterial street, whether to the left or to the right of the driver on the arterial highway, and as to him the statute, Rem. Rev. Stat., Vol. 7A, § 6360-90 [P. C. § 2696-848], quoted above, specifies certain precautions to be exercised at the *entrance* to an intersection with an arterial public highway. However, for reasons that are quite obvious, the language employed in the *Fetterman* case, *supra,* has even a stronger application in a case where the one driver is traveling upon an arterial highway and the other is approaching upon a nonarterial street or highway. A greater danger requires a greater amount of care on the part of the disfavored driver.

■ Applying the rules and principles hereinabove stated to the facts in the case at bar, we cannot escape the conclusion that Richard Hauswirth was guilty of contributory negligence as a matter of law, and that his negligence was a proximate cause of the collision and its consequences.

Accepting his statement that he stopped at or near the edge of Western avenue, and that he then looked to his left and to his right, the fact remains, as he himself testified, that he could then see to his left a distance

of only about one hundred feet, a distance which an automobile traveling upon the arterial highway at the legal rate of fifty miles per hour would cover in less than two seconds. That an automobile was in close proximity to the point which marked the limit of his view, is attested by the fact of the collision. Under the decisions above referred to, it was Richard Hauswirth's duty to make the observation or, in the words of the statute, "look out for and give right of way to any vehicles upon such arterial highway," etc., from a point where, in attempting to cross the intersection, he could see and reasonably decide whether or not he had, and could maintain, a fair margin of safety. That opportunity was afforded him, for it is clear from the photographs in the record that, had he looked from a point coincident with, or near to, the margin of Western avenue, he would have had a clear view for a considerable distance south along Western avenue, and, moreover, could have seen that the Ford sedan was rapidly approaching and was then almost at the intersection. Had he at that point seen the other car, he would have been required and, as he concedes, would have been able, to stop almost instantly. Instead of exercising the necessary caution, however, he proceeded forward in low gear, moving directly into a zone of danger, without giving the slightest attention to what was immediately obvious. He not only failed to allow himself a fair margin of safety, but also failed to take the precautions necessary to determine whether in fact he had, and could maintain, such fair margin of safety. The failure to exercise those precautions, under the existing conditions and circumstances, was contributory negligence determinable as a matter of law, barring recovery by him or his guardian.

As stated earlier in this opinion, the vehicle driven by Richard Hauswirth was a family car. In

operating that car at the time here involved, he was acting as the agent of Mrs. Hauswirth, his mother. His negligence was therefore imputable to her, and operates as a bar to recovery by the administrator of her estate.

The judgments are reversed, with direction to the trial court to dismiss the complaint in each of the two actions, and also dismiss the cross-complaint in the first action.

ROBINSON, C. J., BEALS, SIMPSON, and JEFFERS, JJ., concur.

BLAKE, J. (dissenting)—

"The solution of the question of respondent's contributory negligence does not depend alone upon his own acts, but . . . such question may be largely influenced by the negligence of appellant." *Richmond v. Tacoma R. & Power Co.*, 67 Wash. 444, 460, 122 Pac. 351.

"Generally the question of contributory negligence is for the jury to determine from all the facts and circumstances of the particular case, *and it is only in rare cases that the court is justified in withdrawing it from the jury.*" (Italics mine.) *McQuillan v. Seattle*, 10 Wash. 464, 465, 38 Pac. 1119, 45 Am. St. 799.

"The great weight of authority is to the effect that, before a court will be justified in taking from the jury the question of contributory negligence, the acts done must be so palpably negligent that there can be no two opinions concerning them." *Traver v. Spokane Street R. Co.*, 25 Wash. 225, 239, 65 Pac. 284.

"It is a matter of some interest, as well as of value in this connection, to notice the reason of this, and ask ourselves why it is more rare for a case to be taken from the jury upon the ground of contributory negligence than upon the ground of want of proof of the defendant's negligence? Contributory negligence involves the consideration of affirmative proof of such negligence. It is not something that meets the plain-

tiff's right to recovery by a mere assertion of it on the part of a defendant. It is not a denial; but an affirmation which requires proof before it is of any effect. Hence, when a court decides, as a matter of law, that an injured plaintiff is precluded from recovering damages for his injury, because of his own negligence contributing thereto, the court is in effect deciding that facts have been affirmatively proven which conclusively show, as a matter of law, such contributory negligence. *It is not easy to see why the question of plaintiff's contributory negligence should be decided by the court as a matter of law in the affirmative, under any different circumstances or required degree of proof than that the question of defendant's negligence should be decided by the court as a matter of law in the affirmative.* It is true that the affirmative proof need not necessarily come from defendant's evidence. It may appear in the plaintiff's evidence. The question, nevertheless, involves an affirmative finding in order to be decided as a matter of law in defendant's favor. This is quite a different matter from withdrawing a case from the jury because of the failure of required affirmative proof to sustain a claimed right. In 1 Thompson on Negligence, § 425, that learned author observes:

" 'Contributory Negligence Generally a Question of Fact for the Jury.—As we shall see, the statement is often loosely made in judicial opinions that *negligence* is generally a question of fact for the jury; whereas, the true rule, so far as there can be any rule, is that whether there has been contributory negligence on the part of the plaintiff is a question for the jury, under the same circumstances and subject to the same limitations as the question whether there has been negligence on the part of the defendant. Loose expressions, often found in judicial opinions, to the effect that contributory negligence is generally a question for a jury, are concessions to the obvious principle that whether a man, woman, or child has used, in a particular situation, the care which such persons ordinarily use, or whether they have, under the circumstances, used reasonable care, or acted reasonably, is a question which, as a general rule, is better determined by twelve

men, on a comparison of their experience, than by a single legal scholar on the bench.'

"At § 433 the author makes further observations of interest along this line of thought. *It would indeed be a remarkable case that would call for a directed verdict against a defendant upon the ground that his negligence had been so conclusively proven as to enable the court to so decide as a matter of law; and yet there seems to be no more reason for expecting such disposition of personal injury cases occasionally against a defendant, than to expect directed verdicts against a plaintiff by reason of his contributory negligence.* Both involve an affirmative showing of negligence against an equally strong presumption to the contrary. These observations suggest the exercise of great caution in deciding, as a matter of law, that a defendant is guilty of contributory negligence." (Italics mine.) *Richmond v. Tacoma R. & Power Co.,* 67 Wash. 444, 456, *supra.*

Considering all the surrounding facts and the circumstances—the gross and wanton negligence of the driver of appellants' car—in the light of these rules, I do not think this is one of those "rare cases that the court is justified in withdrawing . . . from the jury." I think the judgment should be affirmed.

MAIN, MILLARD, and DRIVER, JJ., concur with BLAKE, J.