[No. 30089.   *En Banc.*   July 10, 1947.]

FRANK J. LANGER, *Respondent,* v. AUTO INTERURBAN
COMPANY, *Appellant.*[1]

[1]Reported in 183 P. (2d) 188.

*Witherspoon, Witherspoon & Kelley,* for appellant.

*Randall & Danskin (Arthur A. Lundin,* of counsel), for respondent.

ABEL, J.—Plaintiff brought suit for personal injuries suffered and property damage sustained as the result of a collision of his automobile with defendant's passenger bus. The accident occurred August 15, 1942, on a clear, dry day, about three p. m., at the intersection of Freya street and Sprague avenue, in the city of Spokane.

Sprague avenue is a main arterial, heavily traveled, paved highway running in an easterly and westerly direction through Spokane. Freya street runs northerly and southerly, intersecting Sprague avenue at right angles. There are stop signs on Freya street at the southeast and northwest corners of the intersection with Sprague avenue. Sprague avenue, at this point, is forty-eight feet, ten inches wide. Freya street is thirty feet, two inches wide, with a jog to the west, on the north side of Sprague avenue, of seven feet, eight inches. There was a drug store located at the southeast corner of this intersection. The stop sign at the southeast corner of Freya street was located five feet south of the northwest corner of this drug store.

Plaintiff was driving a 1926 model T Ford coupe, which could not go more than six to seven miles an hour in low gear, and he did not dare throw it into high gear in the middle of this intersection in order to speed up, because the car would stall. Plaintiff testified that, if he put his foot on the brake while the car was in low gear, the engine would be killed.

At the time of the accident, there were several cars parked in front of the drug store on Sprague avenue, and there were at least two cars double-parked in front of the drug store. There were several cars stopped on Freya

street, across the intersection, waiting for an opportunity to get onto or across Sprague avenue.

Just prior to the accident, plaintiff was driving north on Freya street. He stopped his automobile, with the front of the car at the stop sign on the southeast corner of the intersection. He looked to the east on Sprague avenue, and then started to cross that street. He testified that he looked to the east after he started, but that he did not see defendant's bus at any time prior to the accident. He proceeded, in low gear, at from six to seven miles an hour, across the intersection. After he had gotten almost through the intersection, the rear of his car was hit by defendant's bus.

Plaintiff suffered a severe head injury, his skull was fractured, and, as testified to by his doctor, "he was mentally confused and semiconscious during these five days." The doctor further testified that plaintiff suffered a concussion, that this frequently results in lack of coordination and loss of memory, and gave as his opinion that plaintiff does not remember things that occurred around the time of this accident. There was other testimony regarding plaintiff's loss of memory.

After a jury trial, plaintiff was awarded judgment in his favor, and defendant appealed.

Appellant makes eleven assignments of error. The first seven are based upon its claim that the trial court should have held, as a matter of law, that respondent was guilty of contributory negligence, because it was undisputed that, if he stopped at all, it was at a place on Freya street where he could not see the approaching traffic on the arterial highway, Sprague avenue, under the existing circumstances, and it was likewise undisputed that he never saw the bus at any time and, hence, could not have been deceived. The remaining assignments of error relate to the rejection of proffered evidence to show that the speed of the bus did not exceed twenty-five miles an hour. This was based upon certain statements made by the bus driver to a police officer who arrived at the scene of the accident approximately fifteen minutes after it occurred.

▬ Dealing with the latter question first, we find that the statements made to the police officer, fifteen minutes after the accident, were self-serving declarations and were not part of the *res gestae* and were properly excluded by the trial court. A similar offer of proof was made in the case of *Williams v. Clayton,* 189 Wash. 282, 64 P. (2d) 1017. We held that the trial court did not abuse its discretion in excluding the proof of the self-serving declarations, made ten minutes after the accident, and ruled that such hearsay would not be a part of the *res gestae.* We stated:

"In such matters, there can be no definite and fixed limit of time, nor is this a question of time, but rather of the right to introduce a self-serving declaration, which, as such, is never permissible. Each case must depend upon its own circumstances. If the trial court has exercised a sound discretion, we cannot interfere. *Walters v. Spokane International R. Co.,* 58 Wash. 293, 108 Pac. 593; 42 L. R. A. (N. S.) 917. We find no evidence of an abuse of discretion and therefore no error in the ruling rejecting the testimony."

Respondent testified that he stopped his automobile on Freya street, before he entered the intersection, with the front of his car even with the stop sign, and it was there that he looked to the east on Sprague avenue. However, at the very maximum, he could not have seen more than one hundred eighty feet from the intersection on Sprague avenue at that time, and, in addition, there were several cars parked on Sprague avenue which would interfere with his vision. He also testified that he later looked to the east, although he does not fix the place, and that he did not, at any time, see the bus.

Respondent stresses the testimony of two witnesses, Mrs. McIntyre and Mr. Nolting. Mrs. McIntyre was standing on the southwest corner of the intersection, facing east. She testified that she saw respondent drive up and stop at the southeast corner, with the front of his car at the crossing. She later testified as follows:

"Well, we stood there talking, and he started to cross the street, and I noticed the bus coming west on Sprague. Q. How far was the bus away from Freya when you first noticed it? A. I can't very well tell. Those are double

blocks out there. It would be a full city block like they are downtown here. Q. A full city block? A. Yes, 300 feet or something like that. . . . Q. And how far south of the intersection was Mr. Langer when you folks first saw him? A. How far south? Q. Yes. A. He was right there at the stop sign. Q. He was stopped the first time you saw him? A. He had just driven up and stopped when Mrs. White called our attention to him. . . . Q. And the front of the Model T Ford, where was that with relation to the arterial stop sign on the southwest corner of Freya and Sprague? A. The southwest corner? We were standing on the southwest corner. Q. I beg your pardon. The southeast corner. A. Where was the front of his car? Q. Yes. A. I imagine — I was about even with the center of his car — his — the front of his car was close to the sidewalk — the intersection, or whatever you call it. Q. In other words, the front of his car was a little bit ahead of the arterial stop sign? A. Well, just around thereabouts; I could not just say. . . . Q. Well, now, as you faced there looking down Sprague, where was the bus at the time that the Langer car was at the stop sign on Freya? A. It was coming west on Sprague. Q. And about how far east of the intersection on Sprague was it? A. I should judge about 300 feet to a city block."

The other witness, Mr. Nolting, testified that he followed the bus as it proceeded west on Sprague avenue, and, at the intersection, just prior to the time that it approached Freya street, he turned to the north on Sycamore street. The distance from Freya street to Sycamore street is approximately three hundred feet. He testified that he saw respondent's car as it was entering Sprague avenue, and that, at the time the car was about a length or more into Sprague avenue, the bus was in the intersection three hundred feet away. He further testified:

"Q. About how far from the south curb line of Sprague was the rear of his car when you first saw him? A. The rear of his car, I could not say exactly. I could see the front of his car. . . . Q. Then, how far from the southeast — from the southwest corner of the curb line of Sprague Avenue, from the south curb of Sprague Avenue was the front of the Langer Model T Ford when you first saw it? A. Well, the rear wheel of the bus was — I would say that it was out here (witness indicating), clear to the back of the — way

on the pedestrian crossing. The front of his car was out here, those two positions."

It is significant that Mr. Nolting testified, on direct examination:

"I slowed down to make my turn, and I had turned, and about that time I looked ahead off to the side and I saw there was going to be a wreck, or it was going to be awful close."

■ In determining the relative rights of vehicles at intersections, we must first consider the statute (Rem. Rev. Stat., Vol. 7A, § 6360-90 [P.P.C. § 295-31]), which provides as follows:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped shall look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection."

Not only was respondent the disfavored driver, in that appellant was approaching from his right, but, in addition thereto, respondent was approaching an arterial highway. The statute requires that a person approaching an arterial highway shall not only stop at the entrance to the intersection but, also, that he shall look out for vehicles simultaneously approaching a given point within the intersection and that he shall give the right of way to such approaching vehicles upon the arterial highway.

In *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, we laid down four rules governing the interpretation of a similar statute. These rules are:

"(1) All rights of way are relative, and the duty to avoid accidents or collisions at street intersections rests upon both drivers.

"(2) The primary duty of avoiding such accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times.

"(3) If two cars collide within the intersection, then they were simultaneously approaching a given point within the intersection, within the meaning of the statute, unless—

"(4) The driver on the left assumes and meets the burden of producing evidence which will carry to the jury the question of fact as to whether or no the favored driver on the right so wrongfully, negligently, or unlawfully operated his car as would deceive a reasonably prudent driver on the left and warrant him in going forward upon the assumption that he had the right to proceed."

The case of *Bowen v. Odland,* 200 Wash. 257, 93 P. (2d) 366, involved an accident where the trial court gave an instruction covering the fourth rule of *Martin v. Hadenfeldt, supra,* and we held that the instruction should not have been given, stating:

"We hold that that portion of instruction No. 11 stating the rule embodied in the fourth paragraph of the principles laid down in the *Hadenfeldt* case, to which appellants excepted, had no application to the facts as shown by the testimony in the case at bar, and should not have been given. Under the statute, the primary duty of avoiding a collision rests upon the driver on the left. The rule laid down by the fourth paragraph of the instruction above quoted is an exception to the general rule and should be applied only in special cases, when rendered appropriate by the evidence. The principle embodied in this paragraph applies in cases in which testimony has been introduced to the effect that the disfavored driver had an opportunity to observe and estimate the situation and actually did so, and further was deceived by some conduct of the other driver which led the disfavored driver to believe that he could proceed within a reasonable margin of safety, and that he was therefore warranted in going forward."

In the case of *Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371, we held the disfavored driver to be guilty of contributory negligence, as a matter of law, and stated:

"The burden to avoid colliding with a car approaching from his right rests heavily upon the disfavored driver. A clear and unambiguous statute imposes this burden, and the ingrafting of exceptions upon this sound and wholesome rule of the road would tend only to confusion and lead drivers occupying the disfavored position under the statute to think that they might somehow escape the burden imposed upon them by law and throw the blame for avoidable accidents upon another. Speed is of much less importance than

safety, and, under modern traffic conditions, safety, to a great extent, depends upon careful and prudent observation both of natural physical conditions and of other vehicles using the highway, as well as of pedestrians. We are in accord with the rules laid down in the *Hadenfeldt* case, but are not inclined to extend the exception therein provided for."

In the case of *Hefner v. Pattee,* 1 Wn. (2d) 607, 96 P. (2d) 583, we held that a person who stopped back of the intersection area, where the view was obstructed, and then started up and entered the intersection without again looking to his right, and was then struck by another car, was guilty of contributory negligence, as a matter of law. In that case, the disfavored driver testified that he looked down the arterial highway, approximately three hundred feet, at the time that he stopped and that he did not look again until the other car was upon him. We stated, at p. 617:

"The burden rests heavily upon the disfavored driver to look out for and give way to traffic which enjoys, as to him, the right of way. Appellant's automobile was there to be seen. The disfavored driver cannot escape the obligation which rests upon him, by saying that he did not see an approaching vehicle, if such vehicle was on the highway and plainly visible. *Silverstein v. Adams,* 134 Wash. 430, 235 Pac. 784; *Strouse v. Smith,* 166 Wash. 643, 8 P. (2d) 411; *Hoenig v. Kohl,* 182 Wash. 245, 46 P. (2d) 728."

In the case of *Hauswirth v. Pom-Arleau,* 11 Wn. (2d) 354, 119 P. (2d) 674, the disfavored driver was held to be guilty of contributory negligence, and, in that case, we said:

"We have had occasion to construe the provisions of the above statute, and also like provisions of similar statutes, and have consistently held that, in situations of the kind here involved, the person upon whom rests the duty of stopping and looking out for vehicles having the right of way must look, or stop and look, from a position where he can see approaching traffic from either direction. *Hamilton v. Cadwell,* 195 Wash. 683, 81 P. (2d) 815; *Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371; *Hefner v. Pattee,* 1 Wn. (2d) 607, 96 P. (2d) 583; *Pyle v. Wilbert,* 2 Wn. (2d) 429, 98 P. (2d) 664; *Fetterman v. Levitch,* 7 Wn. (2d) 431, 109 P. (2d) 1064; *Weaver v. McClintock-Trunkey Co.,* 8 Wn. (2d) 154, 111 P. (2d) 570, 114 P. (2d) 1004."

We followed the above rule in *Miller v. Asbury,* 13 Wn. (2d) 533, 125 P. (2d) 652, and *Bleiler v. Wolff,* 23 Wn. (2d) 368, 161 P. (2d) 145.

In *Gavin v. Everton,* 19 Wn. (2d) 785, 144 P. (2d) 735, the disfavored driver claimed that he came under the fourth rule of the *Hadenfeldt* case, and that it was a question for the jury to determine whether or not he was negligent. We stated as follows:

"The claim of deception must be in good faith. It will be held, as a matter of law, that the claim of deception is not in good faith where the disfavored driver, after seeing the position of the favored driver on his right, engages in a race for the intersection. *Roed v. Washington Laundry Co.,* 160 Wash. 166, 294 Pac. 1023; *McAllister v. Anderson,* 169 Wash. 14, 13 P. (2d) 36. These rules: That the disfavored driver must see the favored driver, must claim to be deceived by him, and may not contest the intersection with him, if he is to claim the benefit of rule four, have been held to be matters of law for the court to decide. That is to say, if the disfavored driver did not see the favored driver, does not claim deception, or admits racing for the intersection, he falls under rule two as a matter of law. The appellant in the case at bar has not been taken out of rule four by these rules.

"The question next arises: When, if ever, will an issue, under rule four, become a question of law for the court to decide? We have no other rule than that it is a question of law only when it can be said that reasonable minds could not differ on the issue. The particular facts in each case must control that question."

In the recent case of *Plenderlieth v. McGuire,* 27 Wn. (2d) 841, 180 P. (2d) 808, the trial court gave an instruction involving the first three rules laid down in the case of *Martin v. Hadenfeldt, supra.* On appeal, it was insisted that the trial court should have given an instruction including the fourth rule of the *Hadenfeldt* case, and, in passing upon this question, we stated:

"From a period in which an instruction setting forth the fourth paragraph of the rule in the *Hadenfeldt* case was given in almost every intersection case, and in which in some instances we even exculpated the disfavored driver from negligence if he had almost cleared the intersection

and there was room for the favored driver to pass behind him, there has come a gradual but marked limitation on the circumstances under which such an instruction is given. The trial courts now want to know how and why and wherein a disfavored driver was deceived, and just what the favored driver did that constituted deceit."

Respondent seeks to avoid the effect of the above decisions by reason of the following: First, where the testimony is that the respondent stopped close to the cross-walk of the intersection, looked to his right, and saw that he had his clearance, and also that he looked again to his right after starting across the intersection, the question as to whether or not respondent exercised due care for his own safety is a question of fact for the jury; and second, where the testimony is that the disfavored driver entered the intersection at a time when the favored driver was three hundred feet to the east, and the physical facts show that the disfavored driver's automobile was struck on the right rear wheel by the bus, just as the disfavored driver was leaving the intersection, there is a question of fact for the jury as to whether or not any failure of the disfavored driver to use due care was a proximate cause of the accident.

Respondent cites the case of *Bennett v. Karnowsky*, 24 Wn. (2d) 487, 166 P. (2d) 192, to sustain his contention. This is a case where the disfavored driver stopped at the intersection of an arterial highway and looked to his right and left. He could only see approximately seventy-five feet to the left for the reason that the arterial highway had an ascending grade of 14.2 per cent approaching the intersection, and the favored driver continued into the intersection until the cars came together, without slackening his speed. The trial court found that the accident was occasioned solely by the lack of observation and the speed of the favored driver. In that case, we stated:

"Having taken all proper preliminary precautions, Karnowsky was justified in proceeding forward, under the belief that he could safely cross the intersection. In his progress through the intersection he did everything that reasonably could have been done, or expected to be done, by him to avoid the collision. On the other hand, appellant

failed to see what was almost directly ahead of him and, seemingly without taking any precaution whatever, 'plunged ahead' along a course which made a collision inevitable, causing the injuries to himself and the damages to the other car as well as to his own."

Respondent also cites the case of *Pyle v. Wilbert*, 2 Wn. (2d) 429, 98 P. (2d) 664, where a jury gave a verdict to the disfavored driver and it was sustained by this court. In fact, the accident in that case occurred at the same street intersection as in the instant case. However, in that case, the favored driver was approaching from the west. The disfavored driver stopped before entering the intersection, looked to the west, where he could see for a distance of two hundred fifty feet, and saw nothing. In that case, we stated that the jury was warranted in finding that the favored driver was traveling at not less than sixty-five miles an hour three blocks west of the intersection, and that the evidence was sufficient to sustain the jury's verdict, in view of the skid marks and the excessive speed at which witnesses testified the automobile was proceeding two blocks west of the intersection.

The evidence in the instant case shows that respondent did not look at a place where he could see. The witness, Mrs. McIntyre, does not assist respondent, since she fixed the place where he stopped his automobile at approximately the same place he himself states that he stopped. Furthermore, in the event that respondent had stopped his automobile and looked to the east at a place where he could see, he would have been approximately in the same relative position as Mrs. McIntyre. She saw the bus, and respondent should have seen it. At no time does she, or Mr. Nolting, testify that respondent looked east. We have examined Mr. Nolting's testimony in detail, and, accepting it as true in its entirety, the only fact that it establishes for respondent is to place him as coming into the intersection, and having passed the sidewalk line, at a time when appellant's bus was two hundred fifty to three hundred feet away. That is the most favorable position that respondent can claim. It is significant that this witness, from

a block away, thought that there was going to be either an accident or close to one.

Bearing in mind that it was the duty of respondent to look at a position from which he could see, and to give the right of way to vehicles simultaneously approaching the intersection, and also bearing in mind the type and kind of an automobile that respondent was driving, together with the method of operating it, and the speed of the automobiles, it is apparent that respondent does not come within rule four of the *Hadenfeldt* case, *supra,* and that his contributory negligence was not a question for the jury.

Respondent claims that, even though he had looked and even though he had seen appellant's bus, he would have been justified in proceeding into the intersection, or at least it was a question for the jury. He calls our attention to the fact that his car was practically across Sprague avenue when its right rear wheel was hit by the bus, and contends that he was entitled to rely on the knowledge that the right of way of cars on the arterial highway is relative only and that the drivers of those cars have, as well, a duty to avoid accidents. And, finally, respondent claims that he was entitled to proceed on the assumption that cars on the arterial highway would observe the speed laws, and that, had appellant's bus been traveling at twenty miles an hour, this being the speed fixed by the city ordinance, instead of a maximum of forty miles an hour, then respondent would have cleared the intersection and there would have been no accident.

Respondent's claim is based upon the proposition that, even though he was not deceived, since the jury had a right to believe that appellant's bus was traveling forty miles an hour when the law fixed the speed limit at twenty miles an hour, and further, that respondent would have passed through the intersection safely in the event that appellant had been traveling at a lawful rate of speed, therefore, whether respondent was guilty of contributory negligence was a question for the jury to decide. We are unable to follow such a line of reasoning, and, as has been frequently

stated, we are unwilling to extend the rules laid down in the case of *Martin v. Hadenfeldt, supra.*

■ Respondent says that, since the disfavored driver was seriously injured in the accident and received a brain concussion which caused loss of memory about events immediately preceding the accident, the question of whether or not the disfavored driver used due care for his own safety is a question for the jury, to be determined from all of the circumstances of the case. In this connection, respondent cites the case of *Morris v. Seattle R. & S. R. Co.,* 66 Wash. 691, 120 Pac. 534. However, that case does not help him, since the facts there were entirely different from the facts in this case  In that case, we stated:

"The respondent's testimony as to what occurred at the time was vague, confused and contradictory. It does not, however, evince a disingenuous attitude on his part, but rather a vague memory or a confused mind.

". . . From his whole testimony on the subject, it was manifest that he had no distinct memory of looking up the track in the direction from which the car came until he was on or nearly on the track."

In the case at bar, respondent suffered a very severe head injury, and, apparently, the trial court considered that it should disregard some of his testimony in view of his mental condition. However, respondent's testimony is positive and distinct. In some places, he has answered questions by stating that he did not remember, but, concerning the facts which are pertinent to this inquiry, his testimony is clear, distinct and positive. We do not find his testimony to be confused. It is true that, in some instances, he testified with more exactness on cross-examination than he did on direct examination; however, that does not evince a confused mind or a lack of memory.

For the reasons herein assigned, the case is reversed, with instructions to dismiss.

MALLERY, C. J., STEINERT, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.

HILL, J., concurs in the result.

MILLARD and SCHWELLENBACH, JJ., dissent.