[No. 29834. Department One. May 1, 1947.]

GLADYS VICTORIA STANLEY, *Appellant,* v. H. K. ALLEN, *Respondent.*[1]

[1]Reported in 180 P. (2d) 90.

McMicken, Rupp & Schweppe, Mary Ellen Krug, and Luther C. Martin, for appellant.

Metzger, Blair, Gardner & Boldt, for respondent.

ROBINSON, J.—The plaintiff brought this action to recover damages for injuries received by being struck by defendant's automobile on January 6, 1945, while proceeding on foot across a Tacoma street at a right-angled intersection. Her principal allegations of negligence were that defendant failed to keep a proper lookout and to yield her the right of way. The jury returned a verdict for the defendant. The trial court denied the alternative post-trial motions and entered a judgment dismissing the action with prejudice. From that judgment, this appeal was duly perfected.

We are not here concerned with the voluminous medical evidence as to the plaintiff's injuries, but only with the evidence pertaining to the question of liability. With the exception of testimony given by a civil engineer in demonstrating to the jury a map of the intersection, the only evidence pertaining to liability was given by Miss Stanley and Lieutenant Allen, the parties to the case. We are strongly impressed with the apparent candor of both. There is an almost total lack of conflict in their testimony, in fact, no more than the following: The defendant, speaking of the plaintiff, testified: "She was dressed in dark clothes." As to that matter, she testified:

"Q. How were you dressed that night? What did you have on? A. Well, I had on a rayon dress and it was blue, and it had white and red figures in it. Q. What kind of coat did you have on? A. I had a light tweed coat. Q. What color was it? A. It was a light tan with blue and red."

The defendant testified that the accident occurred about "6:20." The plaintiff said that the defendant "might be more right than I," but thought the accident occurred between "5:30 and 6:00," because she had intended to hear a certain radio program at six o'clock.

Miss Stanley was injured at the intersection of Tacoma avenue and North 4th street. Those streets, respectively, run in an easterly and westerly, and a northerly and southerly, direction. We will, for convenience, speak of them as if they ran due east and west, and north and south. Lieutenant Allen was driving south on North 4th street. Miss Stanley was walking west on the north crosswalk of Tacoma avenue, and was about five feet from the west curb line of North 4th when struck by Lieutenant Allen's car, approaching from her right.

Miss Stanley was about forty-one years old at the time of the accident. For several years previous thereto, she had been seriously afflicted with multiple sclerosis. During the greater portion of that period, she could not walk without the aid of crutches, but, due to a radical change in medical treatment, she had been able to walk, with the assistance of a cane, for a period of something like eighteen months prior to the accident. She described her movements immediately prior thereto as follows:

"Q. When you came to the cross-walk there, what did you do? A. I stepped down right into the gutter and I looked both ways, because I cannot look both ways and walk at the same time. Q. What did you see at that time? A. I saw a car coming about a block away and I let it go by, because I was not fast, so I gave him the right of way regardless. Q. Was that the car involved in the accident here? A. No. Q. Then what did you do? A. Well, I saw the reflection of some lights and I thought I had plenty of time to get across the street. Q. Then what did you do? A. I walked across on the cross-walk. Q. Where were you when the accident occurred? A. About five feet from the opposite curb. Q. And whereabouts were you with regards the lines of the sidewalk? A. I didn't get that. Q. Will you mark on the map as to where you think you were when the accident occurred? Will you just draw a circle where you were when the accident occurred? A. I imagine I was

right here (indicating). Q. Please draw a circle where you were when the accident occurred. A. (Witness draws circle as requested.) Q. That circle is at the north end of that loop drawn previously by Mr. Allen; is that correct? A. Yes, sir. . . . Q. Let me ask you this, did you run across the street there at that time? A. I could not run. I could not run if I wanted to, so I didn't."

On cross-examination, Miss Stanley further testified as follows:

"Q. Now, you say you let one car pass? A. Yes. Q. Then you started to cross? A. Yes, sir. Q. And you did not at any time see Mr. Allen's car? A. No, sir. Q. Now, he stopped as quickly as you were hit, didn't he? A. Yes, sir. Q. He stopped right there? A. Yes. Q. It was not a case of him continuing on for any distance, or anything? A. Oh, no."

She further testified that Lieutenant Allen offered to take her to a hospital, but that she preferred to go home, and that he took her there and rendered her every possible assistance.

Lieutenant Allen had testified previously, having been called as an adverse witness. He was familiar with the intersection and knew there were stop signs requiring cars to stop before entering Tacoma avenue. He had turned into North 4th a block and a half away and believed that he did so in second gear and then shifted into high. He had his lights on "bright." As the disposition of the case largely depends upon his testimony, we quote it at considerable length, emphasizing certain portions thereof by the use of italics:

"Q. When was the first indication that the plaintiff was in the vicinity—what was your first knowledge that she was around that part of the city? A. *When I heard—she struck the car.* Q. Where was she at that time? *A. She was just about opposite the front—front right fender.* Q. What part of your car came in contact with Miss Stanley? A. As far as I know, she fell onto the fender. Q. The right front fender? A. Yes, sir. Q. The side of the right front fender or back? A. The front part of it. She fell onto it. Q. She fell onto your car as you approached her, is that correct? A. Yes, sir, that is correct; *the car touched her and hit her and she fell on it.* Q. How long is your automobile, roughly?

. . . A. Between 12 and 18 feet. Q. As you approached this cross-walk and stop sign, what were you doing? A. I was preparing to stop as soon as I could get a view up and down the street. Q. Had you been looking up and down the street as you approached the stop sign, to ascertain whether there were any vehicles coming? A. I was preparing to stop. Q. Do you recall whether or not you looked either way at that time? A. I don't recall. I was looking straight ahead, and then— Q. Did you know there was going to be an accident prior to the time it occurred? A. Oh, no. Q. How much sooner did you stop on account of the accident than you otherwise would have stopped? A. Maybe a couple of inches, that is all. Q. *In other words, where you stopped you feel in your own mind would have been about where you would have stopped anyway, is that correct? A. Within a foot of it, yes.*

"Q. Was there any traffic coming from the other direction which blinded your vision of this woman? A. There were no cars. Q. There were no cars going towards and up on 4th Street North, and none going in either direction on Tacoma Avenue, is that correct? A. Not that I remember of seeing. Q. And there was no car in front of you at the time? A. No. Q. And no car following you from behind that you know of? A. No. Q. Do you think you would be able to place on this map just where the front end of your car was when you heard the bump? A. I was coming up here (indicating); it was somewhere right down in here (indicating). Q. If you will take this ruler and bear in mind that the scale of the map is one inch for 10 feet, and that your car would be about an inch and a half long on that map, would you draw your car as it was when the accident occurred? . . .

"Mr. Gardner: If Your Honor please, I do not think we should take the time to fool around trying to draw a car to scale. Let him mark where his car was. These things are estimates at best. Mr. Martin: It should be something representing near the size of his car, something of that kind. The Court: Let him mark an oblong any way he wants to. Mr. Martin: Q. Any way you want to mark an oblong. A. I would say the car was approximately here when I stopped (indicating). Q. Would you put your initials 'H. K. A.' inside of that? A. Yes, sir. (witness writing initials.) Q. That is where your automobile was when it stopped? A. That is approximately correct. Q. Prior to that time you had not stopped at all? A. No, sir. Q. What was

your object in going there before stopping? A. There is a slight hill there both ways, so I could get a clear view of the cars. Q. And also because of those trees marked there, is that not also correct? A. Yes, sir. Q. When you got out of the car, what did you find? A. Well, Miss Stanley was lying about in here (indicating). Q. Would you draw something to represent Miss Stanley? A. I would say she was lying about there (marking). Q. Will you put a 'G. V. S.' in that object that you have drawn? A. (Witness does as requested.) Q. How was the weather, was it raining or drizzling? A. It was raining. Q. Was it about enough to have your windshield wiper going? A. Yes, sir. Q. Your windshield wiper was going? A. It was going. . . . Q. *Your first indication of the fact that Miss Stanley was around in that vicinity was when the accident occurred, is that correct? A. That is correct. Q. You had not the slightest inkling before that, you just did not see her, is that correct? A. That is correct.*"

On cross-examination, defendant, Allen, testified:

"Q. Now, you say it was dark and rainy that night? A. Yes, sir. Q. Now, Mr. Allen, at that time how were the street lights on that corner? A. Well, it was not too well lit. That street is a pretty dark street. Q. Was that during the time these lights were dimmed under orders of the military authorities? . . . A. Well, I would not be positive but I think they were. Q. Now, Mr. Allen, how was Miss Stanley dressed when you found her after the accident? . . . A. *She was dressed in dark clothes.* Q. Do you recall whether or not she was carrying an umbrella? A. I think she had an umbrella and cane, but I am not sure. Q. A cane and umbrella, that is your recollection? A. I could not be positive on that; she had something in her hand. Q. *Are you positive about the dark clothing? A. Yes, sir, she had on dark clothing.* . . .

"Q. Mr. Allen, as you approach Tacoma Avenue from the north, just as you did that evening, will you state whether or not you come up a grade? A. Yes, this is quite a grade. Q. In order to arrive at Tacoma Avenue from North 4th Street, then, as I get it, you come up a grade, is that correct? A. Yes, sir. Q. Now, will you state whether or not you can obtain a view of this intersection up Tacoma Avenue, that is east on Tacoma Avenue and west on Tacoma Avenue, without coming out pretty close to the north curb line of Tacoma Avenue? A. No, you cannot get a clear

view. This is a slight grade here (indicating), and this is a slight grade here (indicating), it is more on this side, and you cannot get a very clear view unless you get just about out where I was, where you get a clear view of it. *Q. State again if the diagram that you have drawn in there in red, 'H. K. A.' representing your car, is where your car stopped? A. This is within a foot of where my car stopped, yes.* MR. GARDNER: I believe that is all. MR. MARTIN: I have no further questions, Mr. Allen. You may be seated. (WITNESS EXCUSED.)"

The map of the intersection referred to in the foregoing testimony of the parties, and upon which each of them indicated where the accident happened, was prepared by an engineer who testified in the case. Lieutenant Allen, when asked to mark where Miss Stanley was lying after the accident, drew an oblong the middle of which is on the south line of the crosswalk, about five feet from the curb line. Miss Stanley, when asked to indicate where she was at the time of the accident, superimposed her mark on the northerly portion of that made by Lieutenant Allen, and wholly within the crosswalk.

We are now in a position to make a resume of the facts. Miss Stanley thought that the accident occurred between five-thirty and six. Lieutenant Allen testified that it occurred about six-twenty. However, the time of the accident is fixed by the pleadings. It is alleged in paragraph No. 4 of the complaint that it occurred "on the 6th day of January, 1945, at approximately 5:30 P. M." This was categorically admitted in paragraph No. 3 of the answer, verified by Lieutenant Allen on September 21, 1945.

Lieutenant Allen, in approaching Tacoma avenue, came up a slight grade (6.4 per cent) and passed the stop sign, with the intention of stopping when he reached a point where he could see up and down the street. It is not claimed that he made an emergency stop, merely a normal one. He says that he stopped at practically the same time he saw Miss Stanley and "within a foot of where he would have stopped anyway," which shows that he did not intend to stop until his car penetrated the crosswalk.

All of the evidence, both oral and physical, is consistent with the conclusion that his car was almost stopped when it struck appellant and fractured the small bone on the left side of her right leg just below the knee. He must have already been moving slowly when he approached the crosswalk. As he was approaching it, Miss Stanley was unquestionably proceeding slowly and directly through the beams of his lights. He did not see her until she had been struck and was falling upon his right front fender. There was no other car in sight anywhere, or any other person or anything else to claim or distract his attention. She was there to be seen. She was crossing on the crosswalk, directly in front of him, in an area highly illuminated by his own lights.

Both parties to the appeal, and especially the respondent, rely on the case of *Rettig v. Coca-Cola Bottling Co.*, 22 Wn. (2d) 572, 576, 156 P. (2d) 914. It is asserted in respondent's brief that that decision "is a specific and complete answer to the one basic contention urged by appellant."

The accident in the *Rettig* case occurred at or near the intersection of two public highways, Greenacres and Cataldo. A passenger bus was being driven in a southerly direction on the westerly side of Greenacres. Several members of the Rettig family were passengers thereon. Following the bus was a truck belonging to the Coca-Cola Bottling Company. The bus stopped at or in the vicinity of the intersection. The Coca Cola truck slowed down to five miles per hour and turned left to pass the stationary bus. Garry Rettig, aged four years and ten months, was the first of the Rettigs to alight. As soon as he alighted, he ran around the front end of the bus and diagonally across the road. He was struck by the truck when he reached the middle of the roadway.

Apparently, the *Rettig* case was not even a crosswalk case; for the opinion says:

"The evidence indicates the front of the bus was somewhat to the south of and beyond the crosswalk when it stopped."

We quote briefly from the *Rettig* opinion:

"The jury could have concluded from the evidence that the driver of the truck was not aware of the presence of the boy and could not have become so, as the bus hid him from view and the position of the driver in the cab of the truck prevented sight of the boy after he emerged from the front of the bus."

The court held that the evidence gave no basis for an instruction to the jury as to a violation of the right of way statute. That holding was bottomed upon the apparent facts that the truck driver not only did not see the boy but also, because of the intervening bus, could not have seen him. The decision is simply that the evidence was not sufficient to warrant a jury in finding that the truck driver was either aware of the presence of the boy or, in the exercise of due care, should have been aware of his presence.

As we have hereinabove stated, the appellant also relies on the *Rettig* case, but her reliance is grounded upon a concise and accurate statement of the law pronounced in the opinion. This reads as follows:

"The statute gives the right of way to a pedestrian crossing a roadway at an intersection, and requires the operator of a vehicle to yield the right of way to him and, if necessary to do so, such operator must slow down or stop the vehicle. *Before this duty arises, the operator must be in a situation whereby [1] he is either aware of the presence of a pedestrian within a crosswalk, or [2], if he had been exercising reasonable care in looking out for and anticipating the presence of a pedestrian within such crosswalk, he should have become aware of his presence there."* (Italics ours.)

■ Lieutenant Allen testified that he was not aware of the presence of Miss Stanley within the crosswalk until she was opposite his right front fender. We can readily believe that testimony. Had he seen her sooner, the accident would not have occurred; for that he was proceeding very slowly, is conclusively shown by his testimony that he came to his intended stop almost at the point of contact. If he had seen her before, or even at the time the front of his car crossed the north line of the crosswalk, he would no doubt have avoided colliding with her, either by increasing the pressure

on his brakes or veering his car to the left. His counsel drew from him in a rather casual way that it was dark, that it was raining, and that Miss Stanley was dressed in dark clothing, but at no time in the course of the trial did he testify that he could not have seen Miss Stanley. Furthermore, no excuse of any kind for his not seeing her was pleaded in his answer. Nor did he testify that he kept a lookout for pedestrians as he came up to and entered the crosswalk, unless the following can be regarded as testimony to that effect. While under examination by adversary counsel, he testified, in part, as follows:

"Q. Had you been looking up and down the street as you approached the stop sign, to ascertain whether there were any vehicles coming? A. I was preparing to stop. Q. Do you recall whether or not you looked either way at that time? A. I don't recall. I was looking straight ahead, and then—"

In making the last answer above quoted, the defendant was interrupted and never completed it, but the conclusion is inevitable, from his own evidence, that, in the process of making a normal stop, he was slowly approaching the crosswalk as Miss Stanley was proceeding directly across his course in the beam of his brightly burning headlights. Even if he had categorically testified that he had looked and did not see her, he was negligent *per se*, under the rules stated in *Silverstein v. Adams*, 134 Wash. 430, 432, 235 Pac. 784, as follows:

"A number of times this court has held that, when a person testifies that he looked and did not see an object, which plainly he could have seen, that he will not be heard to say that he looked and did not see. In other words, the situation is the same as though he had looked and seen the object."

This rule has been stated in various ways in many opinions handed down, both prior to and since the decision in *Silverstein v. Adams*. We quote briefly from some of these opinions:

"Evidence of physical facts making it certain a pedestrian must have seen, or could have seen an approaching car had he looked, renders unavailing his unsupported

statement that he did look but could not see." *Fluhart v. Seattle Electric Co.,* 65 Wash. 291, 298, 118 Pac. 51.

"A person will be deemed to have actually seen what could have been seen if he had looked." *Johnson v. Washington Route,* 121 Wash. 608, 609, 209 Pac. 1100.

"Appellant testified that he looked and did not see the approaching car, then took two or three steps and was struck. Had he looked, he would have seen the approaching car and would not have stepped into its path. He will not be heard to say that he looked and did not see." *Steinheim v. Nicholas,* 171 Wash. 614, 616, 18 P. (2d) 836.

"Even had there been testimony that Mrs. Hamblet had looked but did not see the approaching automobile, still there could have been no recovery." *Hamblet v. Soderburg,* 189 Wash. 449, 453, 65 P. (2d) 1267.

"He could see and hear, and claims to have been in full possession of his faculties. If he had testified that he saw or heard the car, but, for some reason, was not able to avoid it, he might have made out a case for the jury. But to maintain that he never heard or saw the car at all, is to confess his own negligence." *Proper v. Brenner,* 191 Wash. 540, 548, 71 P. (2d) 389.

"Later, it is true, she said she looked to the west when she was a little past the center of the highway, but saw no car. But this does not strengthen her position; for, since it was there, the law charges her with seeing it." *Davis v. Pinkerton,* 199 Wash. 579, 588, 92 P. (2d) 706.

"Even if he did not see the object, he is held to that same degree of care if it is shown that the object was present and could have been seen by looking." *Poland v. Seattle,* 200 Wash. 208, 219, 93 P. (2d) 379.

"Appellant's automobile was there to be seen. The disfavored driver cannot escape the obligation which rests upon him, by saying that he did not see an approaching vehicle, if such vehicle was on the highway and plainly visible." *Hefner v. Pattee,* 1 Wn. (2d) 607, 617, 96 P. (2d) 583.

"In the case of *Silverstein v. Adams,* 134 Wash. 430, 235 Pac. 784, this court held that a person, who testified that he looked and did not see an object which was plainly there to be seen, is bound to the same extent as though he had seen the object. This rule has been consistently followed by this and many other courts." *Cronin v. Shell Oil Co.,* 8 Wn. (2d) 404, 414, 112 P. (2d) 824.

"A person will be deemed to have actually seen what could have been seen if he had looked." *Bleiler v. Wolff*, 23 Wn. (2d) 368, 375, 161 P. (2d) 145.

The assignments of error are as follows:

"1. The court erred in failing to grant appellant's requested Instruction No. 1. 2. The court erred in giving Instruction No. 5. 3. The court erred in failing to grant appellant's motion for judgment n.o.v. 4. The court erred in failing to grant appellant's motion for a new trial."

While urging all of the assignments in her brief, the appellant, in concluding the argument in her reply brief, prays only for a new trial. We shall, therefore, limit our discussion to assignments Nos. 2 and 4.

After the jury had been instructed and had retired to consider the matter, the following occurred:

"MR. GARDNER: Comes now the defendant and excepts to the giving of Instruction No. 5, reading:

" 'It is the duty of the operator of a motor vehicle to yield the right of way to a pedestrian crossing a street within any marked or unmarked crosswalk. In order to yield such right of way to a pedestrian, the operator of the motor vehicle must slow down or stop as the circumstances require.

" 'Therefore, if you find that the defendant failed to yield the right of way to plaintiff as herein required and that such failure was the proximate cause of the accident, then defendant was negligent and your verdict should be in favor of plaintiff.'

"We particularly except to the second paragraph which is read again, 'Therefore, if you find that the defendant failed to yield the right of way to plaintiff as herein required and that such failure was the proximate cause of the accident, then defendant was negligent and your verdict should be in favor of plaintiff,' for the reason it leaves out the word 'negligently.' That instruction should read, 'Therefore, if you find that the defendant negligently failed to yield the right of way—.' That instruction without the word 'negligently' in there tells the jury in effect to return a verdict for the plaintiff, whereas, the law is that if he is driving up there and in the due exercise of care, and under such care fails to see the pedestrian, there is no liability. MR. MARTIN: What statute are you relying on? MR. GARDNER: That is not a statute, that is the law of negligence. THE COURT: I think that is a good criticism. Call out the jury. (Jurors returned

to jury box.) THE COURT: Members of the jury, through inadvertence one word was omitted in paragraph 5, and I will read it as modified. Paragraph 2 of that instruction: 'Therefore, if you find that the defendant "negligently" ' I have inserted 'negligently' failed to yield the right of way to the plaintiff as herein required and that such failure was the proximate cause of the accident, then defendant was negligent and your verdict should be in favor of plaintiff.

"You are to attach no undue importance to the fact that this was re-read to you, it is just to be considered with all of the instructions. You will retire to the jury room."

The plaintiff took exception to the insertion of the word "negligently," and rightly. In the first place, the instruction, as so amended, is patently self-contradictory. As it was originally given, it correctly told the jury that, if the defendant failed to yield the right of way, he was negligent; that is, that his failure was negligence *per se*, negligence in and of itself. The insertion of the word "negligently" was flatly antithetical to this, because it told the jury that the failure to yield the right of way was not negligence in and of itself, but only so if done without due care. This threw upon the plaintiff the identical burden that she would have had had there been no right of way statute. To put it in another way, she was required to convince the jury, not only that the defendant was negligent, but also that he was negligently negligent.

In the second place, no excuse for failure to yield the right of way was pleaded. Because of its careful and thorough analysis of the negligence *per se* rule, we quote at some length from the quite recent opinion in *Ross v. Johnson*, 22 Wn. (2d) 275, 285, 155 P. (2d) 486, a case based, as this case is, upon the defendant's failure to yield a pedestrian a right of way:

"By the great weight of authority, the violation by the driver of an automobile of traffic regulations prescribed by the state or municipality and embodying express commands governing the use of such vehicles constitutes negligence *per se*. 4 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) 437, § 2681. This court is definitely committed to that rule. Many of our decisions are assembled in the recent case of *Portland-Seattle Auto*

*Freight v. Jones,* 15 Wn. (2d) 603, 131 P. (2d) 736, wherein it is said:

" 'Statutes or municipal ordinances prescribing the rules of traffic establish rules of conduct which must be obeyed. They are standards for testing negligence and contributory negligence. The rule in this state is that a violation of those rules constitutes negligence *per se.'*

"The opinion in the cited case then quotes with approval from *Johnson v. Heitman,* 88 Wash. 595, 153 Pac. 331, as follows:

" '*This court is definitely committed to the rule that "a thing which is done in violation of positive law is in itself negligence," in the absence of pleading and proof of such peculiar facts as would tend to justify the violation.* [Citing cases.]

" 'In consonance with that rule, this court, in common with others, has repeatedly held that, in the absence of evidence of circumstances tending to excuse by making such a course reasonably necessary, a failure to observe the law of the road, resulting in injury, is negligence as a matter of law.'

"The language quoted from the *Johnson* case, *supra,* is, in our opinion, peculiarly applicable to the case at bar. Appellant failed to yield the right of way to the respondent, in violation of a positive rule of law, *and there was neither pleading nor proof* of such peculiar facts as would tend to justify the violation."

■ The long-established rule that one who relies upon an excuse to absolve himself from violation of a statute must plead and prove it, is merely a recognition of the plain fact that, in so doing, he is asserting an affirmative defense. In *Martin v. Bear,* 167 Wash. 327, 330, 9 P. (2d) 365, the court adopted and quoted the following from the opinion in *Dohm v. Cardozo & Bro.,* 165 Minn. 193, 206 N. W. 377:

" ' *A defendant who has violated the statute has the burden of proving excuse or justification. He has the affirmative of the issue."* (Italics ours.)

Had the excusatory matter been pleaded, as the law required, the plaintiff would have had the opportunity to deny it, and, upon trial, to request an instruction that defendant had the burden of proof as to the issue thus joined.

The instruction, as amended, not only created a wholly new issue, after the case had been sent to the jury, but left the impression that the plaintiff had the burden of proof.

In the third place, it is questionable as to whether or not, even if pleaded, the excuses relied on, rain, darkness, and dark clothing, can be recognized as legal excuses for running down a pedestrian on the crosswalk. If they are so recognized, the statute designed to protect pedestrians will be greatly weakened. It is unnecessary to definitely rule on that matter in this case. We may, however, note that it was said in *Carmin v. Port of Seattle,* 10 Wn. (2d) 139, 144, 116 P. (2d) 338, a case where a pedestrian was run down while crossing a street during the hours of darkness, "The fact that respondent was wearing black clothing is immaterial," and in the very recent decision of *Miller v. Edwards,* 25 Wn. (2d) 635, 644, 647, 171 P. (2d) 821, a pedestrian-crossing case in which the driver sought to excuse her violation of the right of way statute on the ground of heavy fog:

"The existence of a heavy fog does not lessen the right of way enjoyed by a pedestrian in crossing a street in the proper manner at an intersection. Frequently pedestrians are obliged to cross streets during foggy weather. While this places an added burden to use great care on drivers of automobiles and upon pedestrians, a pedestrian while proceeding in a proper manner still enjoys the statutory right of way. . . .

"If existing weather conditions so greatly restricted Mrs. Edwards' vision, she should have exercised a very high degree of care to compensate for that fact."

Furthermore, in the instant case, had the excuses relied upon been pleaded, we cannot think that the evidence relied on to establish them would have been sufficient to make an issue for the jury, in view of the clear application to the admitted facts of the rule of *Silverstein v. Adams,* hereinbefore cited, with additional supporting authorities.

The judgment appealed from is reversed, and a new trial granted.

MILLARD, JEFFERS, and SCHWELLENBACH, JJ., concur.