[No. 27658. Department Two. December 5, 1939.]

HARRY M. HEFNER *et al., Respondents,* v. GEORGE IRVING PATTEE, *Appellant.*[1]

[1]Reported in 96 P. (2d) 583.

*Eggerman & Rosling,* for appellant.

*Fairbrook & Williams,* for respondents.

BEALS, J.—Plaintiffs, Harry M. and Leah Hefner, husband and wife, sued defendant, George Irving Pattee, seeking judgment for damages on account of injuries suffered by Mrs. Hefner as the result of an intersection collision between plaintiffs' automobile and one driven by defendant. Plaintiffs also asked for damages on account of injuries to their car. Defendant having answered, denying negligence on his part, and pleading contributory negligence on the part of plaintiff Harry M. Hefner, who was driving plaintiffs' car, and cross-complaining for damages to his own automobile, the action was tried to a jury, which returned a verdict in plaintiffs' favor in the sum of fifteen hundred dollars. Defendant's motions for judgment in his favor notwithstanding the verdict, or in the alternative for a new trial, having been denied, judgment was entered upon the verdict, from which defendant has appealed.

Appellant assigns error upon the denial of his challenge to the sufficiency of the evidence; upon the denial of his motions for directed verdict and for judgment in his favor notwithstanding the verdict, or in the alternative a new trial; and upon the entry of judgment in plaintiffs' favor. Error is also assigned upon the court's ruling permitting the jury to view respondents' car; upon the rejection of two exhibits offered by appellant; upon the giving of two instructions; and upon the refusal to give one instruction requested by appellant.

The collision occurred at about seven o'clock in the evening, June 26, 1938. Respondents were driving in their Chevrolet (Mr. Hefner at the wheel) west along east One Hundred Fifth street, a graveled roadway,

and were approaching the intersection with Thirty-fifth avenue northeast, which is an arterial highway running north and south, the center portion being paved to the width of twenty-one feet. Approaching the intersection from the east, One Hundred Fifth street rises at a four per cent grade, while approaching the intersection from the north, Thirty-fifth avenue rises at an eight per cent grade. There is a stop sign on One Hundred Fifth street east of the intersection. A row of telephone poles stands on the shoulder on each side of the paved portion of Thirty-fifth avenue. The country is rather rough, high grass bordering and encroaching on the highways. The record contains two photographs of the intersection, one taken on One Hundred Fifth street to the east of the arterial and the other looking south along Thirty-fifth avenue from a point to the north of the intersection. The situation was evidently one which required careful observation on the part of a driver attempting to cross the arterial highway.

Mrs. Hefner testified that she had no recollection whatever of the collision, as the result of which she suffered serious injuries. Mr. Hefner testified that, as he approached the intersection with Thirty-fifth avenue, he brought his car to a stop at a point ten or twelve feet east of the paved portion of Thirty-fifth avenue. He stated that his view to his left was somewhat obstructed by shrubbery, but that he had a clear view to his right down Thirty-fifth avenue. He testified that he looked to his right, between the second and third poles, his view covering a distance of about three hundred feet; and that, seeing no traffic approaching from the north, respondent's right, along Thirty-fifth avenue, from which direction along the highway appellant's car was actually approaching the inter-

section, respondent looked to his left, and seeing no approaching traffic, put his car into low gear and started to cross the paved portion of the arterial, continuing to look toward his left. When the rear of his car had reached approximately the center line of the arterial, respondent again looked to his right and saw appellant's car approaching at a high rate of speed, which respondent estimated at sixty miles an hour. He testified that he continued on, but that, after his car had proceeded no further than approximately three feet, it was struck on the right rear wheel by appellant's car. The impact threw both respondents from the car, inflicting upon Mrs. Hefner serious injuries.

There was no eye-witness to the accident. One witness testified that he was driving along Thirty-fifth avenue some distance behind appellant's car, but this witness did not see the collision, and his testimony as to the speed of appellant's car is rather vague and indefinite, though indicating that the car was not proceeding at anything like sixty miles an hour.

Rem. Rev. Stat., Vol. 7A, § 6360-90 [P. C. § 2696-848], reads as follows:

"The operator of any vehicle shall stop as required by law at the entrance to any intersection with any arterial public highway, and having stopped shall look out for and give right of way to any vehicles upon such arterial highway simultaneously approaching a given point within the intersection, whether or not such vehicle first reach and enter the intersection."

An intersection area is defined by Rem. Rev. Stat., Vol. 7A, § 6360-1 [P. C. § 2696-767] (u), as follows:

"(u) 'Intersection Area.' The area embraced within the prolongation of the lateral curb lines, or, if there be no curbs, then the lateral roadway boundary lines, of two or more public highways which join one another at an angle, whether or not such highways cross one another."

Neither of the streets above referred to is curbed, and the boundary lines of the streets, taking into consideration their full width of sixty feet, are not clearly defined.

Rem. Rev. Stat., Vol. 7A, § 6360-1 [P. C. § 2696-767] (ww), defines roadway as follows:

"(ww) 'Roadway.' The paved, improved or proper driving portion of a public highway designed or ordinarily used for vehicular travel."

According to a map of the intersection and vicinity, drawn to scale, which was introduced in evidence, the stop sign stands a little less than thirty feet east of the east line of the pavement on Thirty-fifth avenue.

Mr. Hefner, who is herein referred to as respondent, testified that he stopped his car at a point ten or twelve feet east of the pavement line. He drew on the map the position of his car at the point he testified he stopped, which indicates that, in his position at the wheel, he was about seventeen feet east of the pavement line. He testified that he looked to the right, and that the road was clear, "probably down to between the second and third pole;" that a large bush obstructed his view to the left; that, when he started to cross the road, he looked to his left; and that, when his car was a little more than halfway across, he again looked to his right, when he saw appellant's car approaching at a terrific rate of speed, the impact occurring almost instantly.

On further examination by his counsel, respondent stated, in answer to a question as to how long it took his car to go from the position where it stopped to the point where the accident happened: "Well, I would say around seven seconds; about that length of time."

On cross-examination, the following occurred:

"Q. Then how far north on 35th were you able to see from the position where you came to a stop before

entering the highway? A. I looked down to between the second and third pole and there was no car coming in that range. Q. Was there anything to prevent you from seeing farther down the street if you had looked? A. I think a person could have seen farther. My wife was sitting on that side, but that seemed to be a perfectly safe position to cross there. Q. Would it have been possible to see farther than the third telephone pole? A. Yes, it would have been possible. Q. You could see down there probably half a mile? A. Yes, I think so. Q. At any rate when you in that position looked to the right, nothing intervening to obscure your vision, you didn't see any automobile approaching, did you? A. That is right. Q. Then you proceeded ahead and you started to cross the arterial highway? A. I looked to the left, and there was nothing coming from the left, and I started on across. Q. You looked to your left while you were still stopped? A. Well, there was—may I explain this?

"THE COURT: Yes.

"Q. Well, I think my question can be answered by yes or no. A. There was a bush on the left-hand side and you could not see as well to the left, and I was looking to the left as I started up so that I could get a better view. Q. So you kept your vision to the left as you started up there and as you entered the highway? A. Yes. I looked up there far enough to see, and then I looked straight ahead. Q. And as I understand you your rear wheels had reached the center line of the street and your front wheels were three feet off of the concrete before you again looked to your right.

"MR. WILLIAMS: No, he didn't testify to that.

"A. No, I didn't say that. Q. (By Mr. Rosling) Well, if I am incorrect in my recollection of your testimony just correct me. A. Well, the rear wheels—when I first saw Mr. Pattee the back end of my car was not quite across the yellow line. Q. The yellow line is down the center? A. That is right. Q. Then how far —let me see. That would be to the east of the yellow line. Then how far were your rear wheels when you first saw Mr. Pattee? A. Well, they were possibly a foot or two—maybe a foot. Q. They had not quite reached the yellow line then? A. I would say that

that is correct.  Q.  And you hadn't looked to your right from the time that you stopped until that instant when your rear wheels were a foot or two short of the center of the street, isn't that right?  A.  I looked to the right when I stopped—after I had stopped.  That is correct. I hadn't looked again until then.  Q.  You didn't look again until your rear wheels were almost up to the yellow line?  A.  That is right.  Q.  Then you did look to the right?  A.  Then I glanced back to the right again.  Q.  At that instant the front of your car had already left the concrete?  A.  No.  I said that it had left the concrete when his car struck mine.  Q.  Well, how long is your car?  Have you measured it?  A.  It is about 14 feet, or a little over.  Q.  That is right, 14 feet. A.  Yes, sir.  Q.  That is from bumper to bumper?  A. Yes, sir.  Q.  Did your car have bumpers on it?  A. Yes, sir.  Q.  It was a '31 Chev coupe, wasn't it?  A. That is right.  Q.  And having arrived at that position you looked to the right and then saw Mr. Pattee for the first time?  A.  That is right.  Q.  And he was then, as you estimate it, approximately three car lengths away? A.  That is right.  Q.  And do I restate your testimony properly when I say that from the time that you first saw him until the instant of impact you had only moved three feet?  A.  I would estimate that that is about right.  Q.  Yes.  A.  Three or four feet.  Q.  Well, then, the rear end or the bumper of your car was probably over the center line?  A.  It was about, I would say—yes—just about over the center line.  Q. So the entire half of the south bound traffic lane of 35th avenue was blocked by your car, wasn't it, at the instant of impact?  A.  Which half?  Not the south half.  Q.  The west half—that is for south bound traffic. A.  Yes, sir, that is right.  Q.  And at that instant your front wheels were off of the concrete?  A.  Yes, sir."

Later, respondent testified:

"THE COURT:  When you looked to the right you said that you look down two or three poles.  How far would that be?

"THE WITNESS:  Well, I would say between the second and third pole—down to there would be 300 feet— around 300 feet or more.  Q.  (By Mr. Williams) Are

the poles marked up there on the map? A. The distance of those poles was 142 feet apart, and the first pole was about 122 feet from the point of impact.

"MR. WILLIAMS: Could we mark in the distance between these poles?

"MR. ROSLING: The map is drawn to scale, one inch equalling ten feet, and the poles are drawn on the map. I have no objection to your measuring it.

"THE COURT: Where is the second pole?

"THE WITNESS: Here is the second pole (indicating).

"MR. ROSLING: I believe that that is the third pole, isn't it?

"THE WITNESS: Not the third pole from this side. The first pole was about here and the second one here (indicating on map).

"THE COURT: What is the scale of the map?

"MR. ROSLING: I was looking at the other street. One inch equals ten feet.

"THE COURT: Well, just measure from there up to the pole and see how far it is.

"THE WITNESS: It is 14-1/4 inches. That would figure about 142 feet.

"THE COURT: Between poles?

"THE WITNESS: Between poles. This first pole here was on this side (indicating), and the measurement from about the center of this place here (indicating) is 122 feet to this first pole.

"THE COURT: What I mean is, how far did you look down 35th avenue?

"THE WITNESS: I looked down to somewhere between this second pole and the third.

"THE COURT: And you estimate approximately 300 feet?

"THE WITNESS: Yes, sir.

"THE COURT: And you didn't see any car?

"The WITNESS: No, I didn't. Not in that distance."

According to the plat, the telephone poles stand seven or eight feet east of the edge of the pavement. From the position in which he testified he was when he stopped his car, respondent's view of the highway between the second and third telephone poles must

have been, as disclosed by the map, extremely limited, and yet the fact that he observed the arterial between these two poles impressed itself upon his mind. In any event, he testified positively that he looked down the arterial approximately three hundred feet, and that he did not again look to his right for a period of approximately seven seconds, and until he had crossed the east half of Thirty-fifth avenue and was blocking the entire west half of the pavement and directly in the path of a car approaching from his right.

Section 6360-90, *supra,* placed upon respondent the burden of looking out for and giving the right of way to any vehicle upon the arterial highway simultaneously with respondent approaching the intersection. There were no curb lines indicated upon the arterial, the area embraced within the highway outside of the paved portion being, according to the photograph in evidence, not clearly defined. Under the other two sections above quoted, the intersection area was very much less than sixty feet in width, in so far as the arterial highway was concerned, although the highway was, in fact, sixty feet wide.

In the case of *Hamilton v. Cadwell,* 195 Wash. 683, 81 P. (2d) 815, we held that traffic approaching an arterial highway is required to stop immediately before entering upon the highway, at a point where the disfavored driver can see traffic approaching from either direction on the arterial highway.

In the leading case of *Rosenstrom v. North Bend Stage Line,* 154 Wash. 57, 280 Pac. 932, we called attention to the mandatory duty resting upon the disfavored driver to yield the right of way to approaching traffic on the arterial, and that, after the disfavored driver reached the margin of the street,

" . . . there were no intervening objects between him and the stage, and if he failed to see it, it is evident

that he did not look with that degree of care the law requires. The statute cited was enacted in the interests of the public good. Its purpose is to facilitate traffic on the public highways and prevent accidents thereon. It is the duty of every user of the highway to give it heed, and it would seem that under no circumstance would its disregard be justifiable."

The facts in the *Rosenstrom* case differ from those in the case at bar, but the language quoted from the opinion is here pertinent.

In the case of *McAllister v. Anderson,* 169 Wash. 14, 13 P. (2d) 36, in affirming a judgment of the superior court, entered in a collision case after granting a motion for judgment notwithstanding the verdict, this court used the following language:

"It seems to us that the minds of reasonable men can not differ as to the contributory negligence of the appellants. When one driving on a non-arterial street or highway approaches an arterial highway, he knows and is bound to know that travelers thereon having or assuming to have the right of way will be traveling at considerable speed and keeping less than the usual outlook for intercepting cross-traffic."

In the recent case of *Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371, we affirmed a judgment of the superior court dismissing an action for damages resulting from an intersection collision, calling attention to the fact that the disfavored driver undertook to cross an intersecting street without looking to his right from the curb line, from which point he would have had a clear view of approaching traffic, and would necessarily have seen the approaching vehicle, which had the right of way. Neither street was an arterial, but, in view of the facts, that is not an important difference. In the course of the opinion, we used the following language:

"In the case at bar, appellant relied upon a somewhat restricted view of Fifteenth avenue to his right. A

perfectly clear and unobstructed view was available to him after his car advanced only a few feet from where he took the observation upon which he relied. In failing to again look to his right, he was negligent. He did not bear the burden which rested upon him as the disfavored driver, and the trial court properly so held."

It must be borne in mind that respondent testified that, when he stopped his car, he looked to the north along Thirty-fifth avenue approximately three hundred feet, while there was a clear view along that highway for half a mile. If, from the point where respondent made this observation, he could see only three hundred feet along the arterial, whether because of obstructions, or because of the eight per cent down grade of Thirty-fifth avenue, or because of the angle from which he was looking, then he was negligent in not looking again to his right when he reached a point where his view was unrestricted. On the other hand, if, from the point where he made the observation, he could see half a mile along Thirty-fifth avenue, then he should have seen appellant's car approaching, and taken steps to avoid it. He testified positively that he did not see appellant's car until it was approximately three car lengths away.

The burden rests heavily upon the disfavored driver to look out for and give way to traffic which enjoys, as to him, the right of way. Appellant's automobile was there to be seen. The disfavored driver cannot escape the obligation which rests upon him, by saying that he did not see an approaching vehicle, if such vehicle was on the highway and plainly visible. *Silverstein v. Adams,* 134 Wash. 430, 235 Pac. 784; *Strouse v. Smith,* 166 Wash. 643, 8 P. (2d) 411; *Hoenig v. Kohl,* 182 Wash. 245, 46 P. (2d) 728.

There can be no question but that, from any portion

of the level part of Thirty-fifth avenue, one could see to the north along that street at least half a mile. While we do not hold that respondent was bound to stop at the edge of the pavement, he was bound to look to his right as well as to his left before undertaking to cross the pavement, and he was obligated to look from a position where he could observe approaching traffic.

In the case of *Fairchild v. Dean,* 198 Wash. 1, 86 P. (2d) 271, this court, citing *Benson v. Anderson,* 129 Wash. 19, 223 Pac. 1063, used the following language:

"The statutory enactments regulating traffic upon the public highways are made for the purpose of being obeyed. They are the outgrowth of necessity, and on the observance of them depends the safety of the users of the highways. Failure to obey the regulations not only endangers the safety of the person guilty of disobedience, but also endangers the safety of others using the highways in a lawful manner. Courts do not look lightly upon infractions of these regulations."

Respondent cites many opinions of this court in support of the judgment. In several of these cases, the rule laid down in *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, was properly applied, but that rule is not here applicable, as respondent testified that he did not see appellant's car until an instant before the collision.

No two collision cases are exactly alike. No fixed rule can be laid down as to questions of primary negligence or contributory negligence, but certain general principles have been definitely established.

After examination of all the authorities cited by both parties, we are convinced that it must be held that respondent was guilty of contributory negligence as matter of law, and that the trial court erred in not sustaining appellant's motion for judgment in his favor notwithstanding the verdict.

In reaching this conclusion, we are not unmindful of the principle which is stated in the case of *Vercruysse v. Cascade Laundry Co.*, 193 Wash. 184, 74 P. (2d) 920, as follows:

"Plaintiffs having received a verdict, we must, in passing upon the question before us, not only regard all competent evidence in the record which is favorable to the plaintiffs as true, but must also give them the benefit of every favorable inference which may reasonably be drawn from such evidence. If, when so considered, the record reveals sufficient competent evidence to support the verdict, the judgment must be affirmed."

Giving full force to this rule, we are nevertheless convinced that it must be held, as matter of law, that respondent was guilty of contributory negligence.

The judgment appealed from is reversed, with instructions to the trial court to dismiss the action.

STEINERT, GERAGHTY, and JEFFERS, JJ., concur.

BLAKE, C. J. (dissenting)—Under the facts stated in the opinion, I think the question of contributory negligence was for the jury.