[No. 30727.   Department One.   April 29, 1949.]

OAKFORD M. SHULTES, *Respondent,* v. JAMES P. HALPIN *et al.,*
*Appellants.*[1]

[1]Reported in 205 P. (2d) 1201.

*Lycette, Diamond & Sylvester,* for appellants.

*Langlie & Todd,* for respondent.

STEINERT, J.—Plaintiff brought suit against the defendants to recover damages for personal injuries and property loss resulting from a collision between two automobiles within a street intersection. The defendants cross-complained against the plaintiff for damages to their automobile as the result of the same collision. The cause was tried to the court, without a jury. The trial court made findings of fact, drew conclusions of law, and entered judgment thereon in favor of plaintiff. The defendants appealed.

At the time of the collision here involved, respondent, Oakford M. Shultes, was in the act of making a vehicular left-hand turn, toward the west, within a street intersection,

and, while going forward in that direction, was struck broadside by an automobile approaching from the north, which was to the right of the respondent. The automobile which struck respondent's car was owned by the appellants Vincent Halpin and Gene Halpin, husband and wife (impleaded in the complaint as Richard Roe Halpin and Jane Doe Halpin, his wife), and was at the time being driven by their son, appellant James P. Halpin, a single man (described in the complaint as a married person).

Respondent alleged in his complaint that the collision and resulting injuries were caused by the negligence of James Halpin while operating his parents' automobile, such alleged negligence consisting of the following acts and omissions:

"(a) In operating said vehicle without lights during the hours of darkness.

"(b) In operating said vehicle at an excessive and dangerous speed considering the conditions existing at the time and place of the accident.

"(c) In failing to keep a proper lookout, or at all, for other lawful users of the highway.

"(d) In failing to keep the windshield of said automobile clear and in such condition as to afford him a clear view ahead.

"(e) In operating said vehicle without a device in good working order for cleaning *and* [the] exterior portion of the windshield over a sufficient area thereof and in a satisfactory manner to afford said defendant [appellant] a clear view ahead.

"(f) In failing to keep said vehicle under control.

"(g) In failing to do anything to avoid an accident when with the exercise of reasonable care the defendant could and should have avoided colliding with plaintiff's [respondent's] automobile.

"(h) In operating said vehicle while defendant's drivers license was suspended or without any drivers license at all."

By a trial amendment, respondent set up, as an additional ground of negligence on the part of the appellants, the alleged fact that, just prior to the collision, the appellant driver had overtaken another vehicle proceeding in the same direc-

tion toward the intersection and had passed the overtaken vehicle on the right-hand side thereof.

Appellants, in turn, alleged in their cross-complaint that the collision was caused by respondent's negligence in the following respects:

"(1) In making a left-hand turn in front of the defendants' [appellants'] automobile at a time when the same was so close that a collision was inevitable; (2) failing to yield the right-of-way to the defendants, when the defendants were entitled to the right-of-way; (3) in failing to give any signal for a left-hand turn; (4) in cutting the corner in making the turn without proceeding to a proper turning place on said Aurora Ave.; (5) in failing to keep a proper lookout, if any lookout at all, for other persons lawfully using said highway; (6) in failing to keep said automobile under control; (7) in failing to do anything to avoid an accident when, with the exercise of reasonable care, the plaintiff [respondent] could and should have avoided colliding with the defendants' automobile."

At the conclusion of the trial, and after the trial court had rendered a memorandum opinion in the case, respondent's counsel presented findings of fact and conclusions of law, which the court signed and entered, declaring, *inter alia*, that the following specific acts of negligence on the part of the appellants proximately caused the collision and resulting injuries: (1) operating appellants' vehicle at an excessive and dangerous rate of speed, under the conditions existing at the time and place of the accident; (2) failing to observe or heed the caution light at the center of the intersection; and (3) failing to keep appellants' vehicle under control. The court further found that, under the circumstances existing at the time and place of the accident, respondent's left-hand turn was made in the exercise of due care, and that the appellant driver observed respondent's car in a position of peril in sufficient time to have avoided the collision.

In this connection, it will be noted that the trial court did not find, as respondent had previously alleged, that appellants' automobile was operated at the time without lights, or without a proper driver's license, or that its windshield

was improperly maintained or equipped, or that immediately prior to the collision it had overtaken another vehicle and had passed that vehicle on its right-hand side.

The basic questions involved in this appeal, with respect to respondent's right to recover upon his complaint, are (1) whether, under the facts of the case, appellants were guilty of negligence proximately causing the collision and the resulting injuries; and (2) whether respondent was, at the same time, guilty of contributory negligence, barring recovery by him. Similar questions, but conversely affecting the parties, arise upon appellants' cross-complaint.

Appellants' assignments of error are predicated largely upon the findings of fact and conclusions of law made by the trial court and upon the refusal of the court to make certain findings and conclusions proposed by the appellants. It is therefore necessary that we review the evidence in the case.

The accident out of which this suit arose occurred within the intersection of Aurora avenue and Eighty-fifth street, in the city of Seattle. Aurora avenue, one of the main arterial highways of the city and state, extends in a northerly direction from the business section of Seattle to and beyond the northerly city limits. Eighty-fifth street, extending in an easterly-westerly direction and crossing Aurora avenue approximately at right angles, is an arterial street only from the west line of Aurora avenue to points west thereof; east of the intersection, Eighty-fifth street is unimproved.

Aurora avenue is seventy-four feet wide, from curb to curb, north of Eighty-fifth street, and fifty-four feet wide, from curb to curb, south of that street, and is divided into six traffic lanes, three of which carry northbound traffic and three southbound traffic. The outside lane on each side of the avenue, however, is customarily used for parking purposes, and was being so used at the time of this accident. Separating the east half of Aurora avenue from the west half thereof is a raised division, about a foot wide and six or eight inches high.

Eighty-fifth street, the center line of which marks the northerly city limits of Seattle, is thirty-five feet wide west of its intersection with Aurora avenue, and thirty-two feet wide east of the intersection. At the southwest and northeast corners of the intersection were stop signs safeguarding Aurora avenue as an arterial highway, and, suspended above the center of the intersection, was an amber blinker light, which was in operation at the time of the collision here involved.

On October 22, 1947, at about 5:15 p. m., respondent was driving his 1934 Chevrolet coach automobile home from work. Following his usual course, he entered Aurora avenue, from the east, at north Green Lake way, and thence drove in a northerly direction toward Eighty-fifth street, where he intended to turn left and proceed west. It was getting dark at the time, "just turning dusk," and the atmosphere was cloudy and misty. It had been raining to some extent and the pavement was wet. Respondent's car was equipped with a single rain-swipe, attached to that part of the windshield directly ahead of the driver, and through that portion of the windshield the visibility was good, "something less than perfect," but, on account of the rain that had recently fallen, the visibility through the right-hand side of the windshield was, as respondent conceded, "very poor."

Northbound traffic, leading from the central part, or business section, of the city, was quite heavy that evening, as it usually is at that hour of the day, whereas southbound traffic was sparse. Some of the cars traveling along the streets had turned on their lights, but others had not. Respondent's lights were burning at the time, and, as he testified, he could see the headlights of approaching traffic two blocks ahead of him. The street lights had also been turned on in that vicinity.

Concerning the progress of his travel, in his approach to the intersection and his course through it to the point of the collision, respondent testified as follows: After entering Aurora avenue from north Green Lake way, he drove northwardly a block and a half, along the inside lane, next

to the center line, of the avenue, toward Eighty-fifth street, where he intended to turn left, or west, as was his usual custom. Owing to the heavy traffic, however, he was compelled to make a series of stops and starts before reaching Eighty-fifth street, because some of the cars ahead of him were turning to the left at the intersection, while others proceeded straight north, thus slowing the traffic. As he neared the intersection, respondent kept his left hand out as a signal of his intention to make a left turn. In this manner, he finally became second in line at the intersection.

As the front end of his car came about even with, or a few feet north of, the south curb line of Eighty-fifth street, he brought the vehicle to a stop and waited a couple of seconds until the car ahead of him, proceeding straight north, had cleared the intersection. While stopped at that point, respondent took occasion to observe the traffic conditions in front and to the side of him. The only southbound traffic visible to respondent, within two blocks, was a truck coming toward him along Aurora avenue, about a block, or two hundred twenty feet, north of Eighty-fifth street. The truck was traveling at a moderate speed, approximately twenty or twenty-five miles an hour, in the inside lane, near the center line of Aurora avenue. Respondent testified, in response to a leading question, that had there been any other vehicle approaching from the north, alongside the truck, he would have seen it. There was no east-west traffic on Eighty-fifth street at the time.

Having stopped at the entrance to the intersection and taken note of the traffic conditions, respondent thereupon drove slowly straight forward to a point about even with the center of the intersection, where he again stopped to observe traffic conditions. Looking north, he saw the approaching truck, which was then about half a block, or one hundred ten feet, distant. No other traffic was visible to him within a distance of two blocks north of Eighty-fifth street. Concluding that he had plenty of time to cross the west half of Aurora avenue in safety, respondent started to make a left-hand turn.

He had reached a point where the middle of his car was midway in the middle, or second, lane of southbound traffic along Aurora avenue, and had completed about three-fourths of his left-hand turn, when suddenly his car was struck upon the rear portion of its right-hand side by appellants' car traveling south in the middle lane of the westerly half of the avenue. The front end of respondent's car had at that time reached a point six or seven feet east of the west curb line of the intersection. Respondent did not see appellants' car until it was within ten feet of him, and then only out of the corner of his eye. On cross-examination, he testified:

"Q. Do you recall telling the traffic officer that when you came up you started to make your left hand turn—boom! —it happened just that quick? A. Yes, I remember telling somebody that. I don't know if it was the traffic officer."

In the course of respondent's testimony, the trial court interrogated him, as follows:

"THE COURT: I'd like to ask one question. You told me I believe in the beginning that you saw the truck. THE WITNESS: Yes. THE COURT: First, when it was nearly a block away? THE WITNESS: Yes. THE COURT: Then you saw it again about in the middle of the block? THE WITNESS: Yes. THE COURT: Did you see any other car alongside of it or anywhere near it? THE WITNESS: No, I didn't see a sole car. I thought I had plenty of time to get clear of the truck. THE COURT: Did you look again after the point at the middle of the block? THE WITNESS: Yes, I did. I know how bad the traffic is. THE COURT: Did you— Where did you look again? THE WITNESS: That was when I just started my turn. THE COURT: Well,— THE WITNESS: The first look I took was when I got into the intersection. THE COURT: Where was the truck again? THE WITNESS: Well,— THE COURT: I am asking, after you saw it the second time, it was in the center of the block? THE WITNESS: Yes. THE COURT: Did you look again at the truck, this oncoming truck? THE WITNESS: No, I didn't. THE COURT: Didn't look that way at all? THE WITNESS: No,— Well, just as I saw Mr. Halpin, that is when I— . . . THE COURT: How long would it take you to get out of there? THE WITNESS: I don't know, Your Honor, in a second—two seconds, I imagine. I don't—I mean I didn't start with a jackknife start;

started like you usually start. I saw I had plenty of time to get ahead of the truck so there was no immediate jumping right off the gun. THE COURT: Your car hadn't moved only about its length, about fifteen feet? THE WITNESS: That was about all. I saw I had plenty of time. THE COURT: Apparently you didn't. THE WITNESS: I guess I didn't."

The force of the impact was so great that respondent's car was hurled a distance of thirty feet in a southwesterly direction, causing its left-hand side to crash broadside into a third car which was standing at the southwest corner of the intersection, waiting for northbound and southbound traffic to clear. As a result of the collision, respondent sustained severe personal injuries and his car was practically demolished.

Respondent's testimony was in part corroborated by that of his only witness, Walter Meerstein, the owner and operator of the automobile which was standing at the southwest corner of the intersection and against which respondent's car was thrown. Meerstein testified that respondent stopped momentarily at the entrance to the intersection and then continued forward to the point where the collision occurred, about twelve or fourteen feet from the center of the intersection; that the distance from the point where respondent first momentarily stopped to the point of the collision was about twenty-five feet; and that respondent's speed at the time of the impact was about seven or eight miles an hour, while that of the appellant driver was thirty or thirty-five miles an hour. However, Meerstein did not observe the truck, mentioned above, approaching from the north, along Aurora avenue, but was of the opinion that appellants' automobile was the only southbound motor vehicle in that immediate vicinity at the time.

Appellant James Halpin and his brother, William Halpin, were the only eyewitnesses who testified in behalf of the appellants.

The substance of James Halpin's testimony, on direct examination, is as follows: Accompanied by his brother William, James was driving his parents' Dodge sedan, with its

headlights burning, south along Aurora avenue toward Eighty-fifth street. For some distance he had been traveling in the middle lane of the three lanes of traffic on the west side of Aurora avenue, and was intending to make a right-hand turn at Eighty-fourth street, one block south of Eighty-fifth street, and then stop at a drive-in restaurant nearby. There was no southbound traffic in the block immediately north of Eighty-fifth street, except appellants' Dodge sedan and a flat-bed truck which was traveling in the inside lane on the west half of Aurora avenue. The truck was to the left of the Dodge sedan, but about a car's length behind it. He had not passed the truck within a block or two and had been ahead of it at least from Eighty-sixth street to Eighty-fifth. He was traveling at a speed of about thirty miles an hour, which was gradually decreased to fifteen miles an hour at the time of the impact.

When James Halpin first saw respondent, the latter was just entering the intersection at Eighty-fifth street, seventy-five or one hundred feet distant from the Halpin car. James did not see respondent stop, nor did he see the latter give any hand signal. Although at that time respondent appeared to be slowing down on account of the car ahead, he was nevertheless proceeding straight forward at a speed of about ten miles an hour. When James first became aware that respondent was beginning to turn in the intersection, respondent was but fifty feet, or less, away from the Halpin car, whereupon James applied his brake, but was unable to swerve to his left because of the truck that was approaching on his left rear side. His testimony concerning the location of the point of impact was substantially the same as that of the respondent.

On cross-examination, James Halpin testified that he did not look up to see the caution light suspended above the intersection, and that he could not remember whether he saw it at all before the collision; nor could he remember whether or not he had seen the Meerstein car standing at the southwest corner of the intersection.

William Halpin's testimony definitely corroborated that of James Halpin.

Clarence W. Hodge, police officer and traffic investigator, arrived at the scene of the accident about ten minutes after its occurrence, whereupon he took measurements to determine the location of the point of collision. He testified that the debris on the pavement established the point of impact as eighteen feet south of the north curb line of Eighty-fifth street, and twenty-four feet east of the west curb line of Aurora avenue. His testimony in that respect harmonized with that of all the other witnesses in the case. He further testified that, after talking to respondent and to James Halpin, and after observing the two cars immediately involved, he gave a "ticket" or "citation" to respondent.

The damage to the Halpin car was between five hundred and seven hundred dollars.

Upon the evidence thus summarized, the trial court found for the respondent.

■ In our approach to this case as presented on the appeal, we have in mind the generally accepted rule that, in the review of a judgment of the trial court based upon findings made by that court, the respondent is entitled to the benefit of all evidence, and the reasonable inferences therefrom, in support of his judgment; and, in its scrutiny of the record, the appellate court will consider only the evidence most favorable to the respondent, and will eliminate from consideration all evidence contrary thereto or in conflict therewith. 5 C.J.S. 700, Appeal and Error, § 1656; 3 Am. Jur. 461, Appeal and Error, § 897. See, also, *Cummins v. Dufault,* 18 Wn. (2d) 274, 139 P. (2d) 308; *Browning v. Bremerton-Charleston Transit Co.,* 28 Wn. (2d) 713, 183 P. (2d) 1005.

■ We also bear in mind the familiar rule that, where a cause is tried to the court without a jury, the trial court's findings of fact will not be disturbed on appeal unless the evidence clearly preponderates against them. *Warner v. Keebler,* 200 Wash. 608, 94 P. (2d) 175; *McLean v. Continental Baking Co.,* 9 Wn. (2d) 176, 114 P. (2d) 159; *Bleiler*

*v. Wolff,* 23 Wn. (2d) 368, 161 P. (2d) 145; *McMahon v. MacKinnon,* 28 Wn. (2d) 442, 183 P. (2d) 173.

This latter rule is based upon the theory that there is a conflict in the testimony and that the trial court, having the witnesses before it, is in better position to arrive at the truth than is the appellate court. For this reason, the rule has no application in a case where there is no substantial dispute as to the facts and no question as to the credibility of witnesses or the weight to be given to their testimony, but where the sole question on appeal concerns the proper conclusions to be drawn from practically undisputed evidence; in such situation, this court has the duty of determining for itself the right and proper conclusions to be drawn from the evidence in the case. *Westland v. Post Land Co.,* 115 Wash. 329, 197 Pac. 44; *Doke v. United Pac. Ins. Co.,* 15 Wn. (2d) 536, 131 P. (2d) 436, 35 P. (2d) 71.

■ In our opinion, there can be no doubt that the trial court was fully justified in finding the appellant driver, James Halpin, guilty of negligence which was *a* proximate cause of the collision and consequent injuries. In fact, appellants advance but little argument to the contrary, but content themselves with saying, upon that issue, that the facts show that there was no excessive speed or negligence on the part of the appellants. The evidence which the court had the right to believe, and the reasonable inferences to be drawn therefrom, in our opinion establish that the appellant driver was guilty of at least two acts of negligence which contributed to the collision: (1) he was traveling at a rate of speed greater than was reasonable or proper under the conditions existing at the particular point of operation, contrary to the provisions of Rem. Supp. 1947, § 6360-64; and (2) he failed to note or heed the flashing "Caution" light suspended above the intersection, which required him to proceed through such controlled area "with extra caution," as commanded by Rem. Supp. 1947, § 6360-98.

In this connection, respondent contends that the appellant driver was guilty of at least one additional act of negligence causing the collision, in that, having overtaken the truck

proceeding south along Aurora avenue, the appellant driver passed the overtaken vehicle on its right-hand side, in violation of Rem. Rev. Stat., Vol. 7A, § 6360-77 [P.P.C. § 295-5], which provides:

"Any person driving a vehicle upon any public highway of this state and overtaking another vehicle proceeding in the same direction shall pass to the left of such overtaken vehicle: . . ."

We do not agree that the record supports this contention, but we think it will be more appropriate to discuss that matter at another point in this opinion.

Appellants' main contention upon the appeal is that respondent was guilty of contributory negligence and that such negligence was the sole proximate cause of the accident. Their argument upon this point is that respondent's own testimony, and that of all the other witnesses in the case as well, show that respondent made a left-hand turn directly in front of appellants' oncoming automobile, without seeing it, although appellants' car then was, and had to be, only a relatively few feet away in distance and only a split second away in time. This, the appellants say, was not a yielding of the right of way as required by law, but was a flagrant violation of Rem. Rev. Stat., Vol. 7A, § 6360-89 [P.P.C. § 295-29].

That section of the statute provides:

"It shall be the duty of any operator of any vehicle upon entering an intersection and having signalled his intention as required by law to turn such vehicle to the left to look out for and give right of way to vehicles approaching in the opposite direction and thereby placed on his right, simultaneously approaching the given point within the intersection, whether such vehicle first enter and reach the intersection or not. . . ."

Rem. Rev. Stat., Vol. 7A, § 6360-88 [P.P.C. § 295-27], which is virtually a re-enactment of Rem. 1927 Sup., § 6362-41, subd. 14, contains the following provision:

"It shall be the duty of every operator of any vehicle on approaching public highway intersections to look out for and give right of way to vehicles on their right, simultane-

ously approaching a given point within the intersection, and whether such vehicle first enter and reach the intersection or not. . . ."

This last quoted section constitutes the basic law governing the operation of vehicles at street intersections. *Bowen v. Odland,* 200 Wash. 257, 93 P. (2d) 366; *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265.

■ These last two sections of the statute should be read and considered together, in cases of the kind now before us, for the reason that this court has frequently stated or indicated that the rules laid down in the case of *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, construing Rem. 1927 Sup., § 6362-41, subd. 14 (now Rem. Rev. Stat., Vol. 7A, § 6360-88), are applicable to left-turn cases governed by § 6360-89, *supra. Vance v. McCleary,* 168 Wash. 296, 11 P. (2d) 823; *Mercilliott v. Hart,* 173 Wash. 224, 22 P. (2d) 658; *Levine v. Owen Lbr. Co.,* 196 Wash. 673, 84 P. (2d) 353; *Jamieson v. Taylor,* 1 Wn. (2d) 217, 95 P. (2d) 791.

In the *Hadenfeldt* case, *supra,* we declared the following rules applicable to intersectional collision cases:

"(1) All rights of way are relative, and the duty to avoid accidents or collisions at street intersections rests upon both drivers.

"(2) The primary duty of avoiding such accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times.

"(3) If two cars collide within the intersection, then they were simultaneously approaching a given point within the intersection, within the meaning of the statute, unless—

"(4) The driver on the left assumes and meets the burden of producing evidence which will carry to the jury the question of fact as to whether or no the favored driver on the right so wrongfully, negligently, or unlawfully operated his car as would deceive a reasonably prudent driver on the left and warrant him in going forward upon the assumptior. that he had the right to proceed."

■ In the case at bar, respondent does not claim, nor could he claim, that he was deceived by any wrongful operation of appellants' automobile, for the simple reason that

respondent never saw that car until an instant before the collision. *Hauswirth v. Pom-Arleau*, 11 Wn. (2d) 354, 119 P. (2d) 674; *Billingsley v. Rovig-Temple Co., supra; Gavin v. Everton*, 19 Wn. (2d) 785, 144 P. (2d) 735; *Cramer v. Bock*, 21 Wn. (2d) 13, 149 P. (2d) 525; *Calvert v. Seattle*, 23 Wn. (2d) 817, 162 P. (2d) 441; *Boyle v. Lewis*, 30 Wn. (2d) 665, 193 P. (2d) 332.

In the *Hauswirth* case, *supra*, we said:

"Since the two cars collided within the intersection, it must be held that prior thereto they were 'simultaneously approaching a given point within the intersection,' as that phrase has been construed by this court. *Martin v. Hadenfeldt*, 157 Wash. 563, 289 Pac. 533, and cases following it. The exception noted in that case, with respect to a situation where the disfavored driver is 'deceived' by the wrongful operation of the favored driver, has no application here, for the reason that, in this case, Richard Hauswirth never saw the Pom-Arleau car at all; he therefore could not have been deceived by its wrongful operation. The exception referred to in the *Hadenfeldt* case, *supra,* presupposes a situation where the disfavored driver sees or has the opportunity of observing the favored vehicle and is deceived by the actions of the driver of that vehicle. *Bowen v. Odland*, 200 Wash. 257, 93 P. (2d) 366; *Delsman v. Bertotti*, 200 Wash. 380, 93 P. (2d) 371; *Jamieson v. Taylor*, 1 Wn. (2d) 217, 95 P. (2d) 791."

■ Since there is no claim, nor ground for holding, that respondent was "deceived," he necessarily comes within the application of the second rule of the *Hadenfeldt* case, *supra,* which reads:

"The primary duty of avoiding such accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times."

*Roed v. Washington Laundry Co.*, 160 Wash. 166, 294 Pac. 1023; *Department of Labor & Industries v. Hickle*, 1 Wn. (2d) 475, 96 P. (2d) 577; *Gavin v. Everton, supra; Calvert v. Seattle, supra.*

For the same reason, respondent would come within the application of the express provisions of Rem. Rev. Stat.,

Vol. 7A, § 6360-89, which requires that any motor vehicle operator who enters an intersection and signals his intention of turning to the left shall

" . . . look out for and give right of way to vehicles approaching in the opposite direction and thereby placed on his right, simultaneously approaching the given point within the intersection, whether such vehicle first enter and reach the intersection or not. . . . "

■ Failure to look out for and give right of way to a vehicle on the right simultaneously approaching a given point within the intersection constitutes negligence as a matter of law. *Snyder v. Smith,* 124 Wash. 21, 213 Pac. 682; *Rhodes v. Johnson,* 163 Wash. 54, 299 Pac. 976; *Strouse v. Smith,* 166 Wash. 643, 8 P. (2d) 411; *Vance v. McCleary, supra; Delsman v. Bertotti,* 200 Wash. 380, 93 P. (2d) 371; *Hefner v. Pattee,* 1 Wn. (2d) 607, 96 P. (2d) 583; *Hauswirth v. Pom-Arleau, supra; Billingsley v. Rovig-Temple Co., supra; Gavin v. Everton, supra; Langer v. Auto Interurban Co.,* 28 Wn. (2d) 343, 183 P. (2d) 188; *McClellan v. Great Western Fuel Co.,* 32 Wn. (2d) 202, 201 P. (2d) 221.

Construing the right of way statutes, this court has many times voiced the precept that the burden of avoiding a collision at a street intersection rests not only primarily, but also heavily, on the driver who occupies the disfavored position, and that he must perform his duty in that respect with reasonable regard to the maintenance of a fair margin of safety at all times.

In *Sather v. Blodgett,* 169 Wash. 25, 13 P. (2d) 60, this court, in affirming a judgment dismissing an action for damages for personal injuries sustained in an automobile collision, said:

"Appellant, being in the disfavored position, was charged with the greater burden, and the duty was upon him to maintain a fair margin of safety. Since appellant produced no evidence to indicate that respondent 'so wrongfully, negligently, or unlawfully operated his car as would deceive a reasonably prudent driver' in his (appellant's) position, there was no question to go to the jury."

In *Hoenig v. Kohl,* 182 Wash. 245, 46 P. (2d) 728, wherein a judgment notwithstanding the verdict of a jury in favor of the plaintiff was affirmed, this court made the following statement:

"Being the disfavored driver, it was incumbent upon him to yield the right of way unless the situation was such as to clearly indicate that he could cross with a fair margin of safety."

In *Delsman v. Bertotti, supra,* an action for damages for personal injuries was dismissed by the trial court, after sustaining a challenge to the sufficiency of plaintiff's evidence. In affirming the judgment, this court said:

"The burden to avoid colliding with a car approaching from his right rests heavily upon the disfavored driver. A clear and unambiguous statute imposes this burden, and the ingrafting of exceptions upon this sound and wholesome rule of the road would tend only to confusion and lead drivers occupying the disfavored position under the statute to think that they might somehow escape the burden imposed upon them by law and throw the blame for avoidable accidents upon another. Speed is of much less importance than safety, and, under modern traffic conditions, safety, to a great extent, depends upon careful and prudent observation both of natural physical conditions and of other vehicles using the highway, as well as of pedestrians."

In *Warner v. Keebler, supra,* this court, in construing Rem. Rev. Stat., Vol. 7A, § 6360-88, *supra,* said:

"While all rights of way are relative, the primary duty of avoiding accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times."

In *Hefner v. Pattee, supra,* appears this statement:

"The burden rests heavily upon the disfavored driver to look out for and give way to traffic which enjoys, as to him, the right of way. Appellant's automobile was there to be seen. The disfavored driver cannot escape the obligation which rests upon him, by saying that he did not see an approaching vehicle, if such vehicle was on the highway and plainly visible."

In *Fetterman v. Levitch,* 7 Wn. (2d) 431, 109 P. (2d) 1064, involving § 6360-88, *supra,* this court, upon the basis of a number of authorities therein cited, said:

"What this court has frequently declared, and more often indicated, the correct rule to be, and the rule which we again repeat, and now adhere to, is that the *primary,* not the absolute, duty of avoiding an accident at an intersection rests upon the driver on the left, which duty *he must perform with reasonable regard to the maintenance of a fair margin of safety* at all times."

In *Billingsley v. Rovig-Temple Co., supra,* involving the same statute, this court again expressed its views upon the subject, as follows:

"Although all rights of way are relative and the duty of avoiding a collision in this instance rested upon both drivers, the primary duty in that respect was upon the respondent, for he was the driver on the left, and that duty he was required to perform *with a reasonable regard to the maintenance of a fair margin of safety.* [Citing cases.]"

In light of the principles of law hereinbefore stated, the crucial question in this case is whether, under the circumstances here present, the respondent, who was the disfavored driver, met the burden and discharged the duty imposed upon him by statute, with reasonable regard to the maintenance of a fair margin of safety. In determining that question, we of course must, and do, confine ourselves to the evidence most favorable to respondent, and eliminate all evidence in conflict therewith.

Proceeding strictly upon that requirement, we think it must be said, as a matter of law, that respondent did not meet the burden nor discharge the duty thus imposed upon him. The evidence in his behalf, considered in its most favorable light, may be compressed into this brief statement: Respondent stopped momentarily at the entrance to the intersection, where he observed a truck approaching him about a block ahead, but he did not see appellants' car, which was likewise approaching him; he then drove straight forward to the center of the intersection, where he again stopped momentarily and from that point observed the

approaching truck, then but half a block away, but, again, he did not see appellants' car, which likewise was at the same time approaching; he thereupon turned to the left, around the center of the intersection, and, with clouded windshield, proceeded directly across the pathway of approaching traffic; in a second's time, he had moved fifteen feet, into the lane occupied by appellants' car, when, to use his words, "boom! it happened just that quick." It might be here observed that respondent, under his own testimony, allowed but three seconds in which to clear both lanes of oncoming traffic.

This was not a yielding of the right of way, in compliance with the statute, nor did it evidence a reasonable regard to the maintenance of a fair margin of safety.

■ Respondent endeavors to justify his action in proceeding across the intersection, by reason of the alleged fact that his view of appellants' car was obstructed by the truck approaching southwardly along the inner lane of the westerly half of Aurora avenue.

It is difficult for us to believe that, throughout the entire time that respondent's automobile was within the intersection, whether stopped or in motion, appellants' car was totally screened from view by the moving truck approaching from the north. But, even if we assume that such was the case, that would not absolve respondent from contributory negligence. Appellants' car was traveling along the middle lane of Aurora avenue, as it had the right to do. Merely because respondent could not at a particular time, and in a particular position, see approaching traffic moving along the west side of the truck, and screened thereby, he was not justified in assuming that no such traffic was there.

It was respondent's duty to make his observations at a time and from a position when and where he could determine whether there was such traffic in the middle lane.

We have frequently declared the law to be, in such cases and situations, that the disfavored driver must look from a point at which he can see and reasonably decide whether or not he can proceed across an intersection with a fair margin

of safety. *Delsman v. Bertotti, supra; Hefner v. Pattee, supra; Fetterman v. Levitch, supra; Hauswirth v. Pom-Arleau, supra; Plenderlieth v. McGuire,* 27 Wn. (2d) 841, 180 P. (2d) 808; *Anderson v. Kurrell,* 28 Wn. (2d) 227, 182 P. (2d) 1; *Langer v. Auto Interurban Co., supra.*

The following language appearing in the case of *Calvert v. Seattle, supra,* may appropriately be repeated here:

"To accept respondent's theory would be to put a premium upon negligence of the worst kind. Heedless, reckless, and incompetent drivers could rush into busy intersections, cause irreparable damage, and then, by saying that they did not see the favored driver, put themselves in a more favored position than careful and thoughtful operators of automobiles."

To support his contention, respondent relies upon the following cases: *Vercruysse v. Cascade Laundry Co.,* 193 Wash. 184, 74 P. (2d) 920; *McLean v. Continental Baking Co.,* 9 Wn. (2d) 176, 114 P. (2d) 159; and *Bennett v. Karnowsky,* 24 Wn. (2d) 487, 166 P. (2d) 192.

In the *Vercruysse* case, *supra,* there was evidence, as this court pointed out, to the effect that when the disfavored driver made the left-hand turn, the favored vehicle, approaching from the opposite direction, was beyond the range of visibility, owing to a heavy snowstorm. Nothing that the disfavored driver could have done in that circumstance would have altered the situation, for it was a condition over which he had no control, no matter what course he took, nor from what point he made his observation. In the *Bennett* case, *supra,* the disfavored driver did not have a clear view of the traffic approaching along an arterial street, simply and solely because of the steep grade of the arterial street beyond the intersection. Nothing that the disfavored driver could have done would have altered that situation. Furthermore, as the opinion therein discloses, the disfavored driver, before and while crossing the intersection, did everything that reasonably could have been done, or expected to be done, by him to avoid the collision. The situation in each of those cases is quite different from that presented in this case, for, here, respondent could easily have determined

whether there was any southbound traffic in the middle lane, by simply waiting a second or two until the oncoming truck had passed in front of him. The *McLean* case, *supra,* does not present an analogous situation on the point here involved and, therefore, requires no further comment. .

One of respondent's principal contentions is that the collision was caused by the fact that, just before the impact, appellants' car overtook the truck proceeding south along Aurora avenue, and, having overtaken it, passed it on the right, in violation of Rem. Rev. Stat., Vol. 7A, § 6360-77. As stated in the early part of this opinion, that issue was first injected into the case by trial amendment. The record discloses that this constituted respondent's principal claim of alleged negligence.

However, neither the claim nor the present contention is supported by the evidence. Respondent did not testify that such was the fact, and clearly he could not so testify, for he never saw appellants' car until an instant before the collision. His only witness, Meerstein, did not so testify, but, on the contrary, stated that he never saw the truck at all. On the other hand, both James and William Halpin testified that appellants' car was traveling ahead of the truck. Finally, the court refused, or at any rate failed, to find that appellants' car passed the truck, and there is nothing in the evidence which, in our opinion, would justify an inference that appellants' car ever passed the truck in that entire block.

The final contention made by respondent is that, even though he was guilty of contributory negligence in proceeding across the intersection without having a fair margin of safety, nevertheless the appellant driver could have avoided the collision, under the doctrine of last clear chance, as expounded in the case of *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302.

We have frequently held that the question whether the doctrine of last clear chance is applicable in a given case is a question of law to be determined by the court. *Hartley v. Lasater,* 96 Wash. 407, 165 Pac. 106; *Burlie v. Stephens,* 113

Wash. 182, 193 Pac. 684; *Rossier v. Payne,* 125 Wash. 155, 215 Pac. 366; *Delsman v. Bertotti, supra; Erickson v. Barnes,* 6 Wn. (2d) 251, 107 P. (2d) 348.

The facts in this case show that, after respondent began his left-hand turn at the center of the intersection, only a second or two elapsed before the impact occurred. The interval of time thus afforded the appellant driver was wholly insufficient to avoid the collision. This doctrine to which we are now referring contemplates a last *clear* chance, not a last *possible* chance.

We are convinced that upon no theory of the case can respondent recover, because of his contributory negligence as a matter of law.

For reasons herein stated, the judgment is reversed with respect to respondent's action, with direction to the trial court to dismiss that action, and it is affirmed with respect to the dismissal of appellants' cross-action.

JEFFERS, C. J., BEALS, MALLERY, and HILL, JJ., concur.